UNITED STATES of America,
Appellee,

v.

Joseph CATALDO and James Lucakos,
a/k/a James Lucas, T/N James
Lucakas, Defendants-Appellants.

Nos. 110, 111, Dockets 34644, 34659.

United States Court of Appeals,
Second Circuit.

Argued Sept. 17, 1970.

Decided Oct. 26, 1970.

 

Herald Price Fahringer, Jr., Buffalo, N. Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., and Irving Anolik, New York City, of counsel), for Joseph Cataldo.

H. Elliot Wales, New York City, for James Lucas.

Harold Baer, Jr., Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., S. D., New York, and James W. Brannigan, Jr., and Ross Sandler, Asst. U. S. Attys., New York City, of counsel), for appellee.

Before WATERMAN, MOORE and KAUFMAN, Circuit Judges.

MOORE, Circuit Judge:

Joseph Cataldo (Cataldo) and James Lucakos (Lucas)[1] appeal from judgments of conviction after trial to court and jury of the crimes of conspiracy and receiving and selling securities of a value in excess of $5,000 moving in interstate commerce, knowing the securities to have been stolen, 18 U.S.C. §§ 2, 371, 2314 and 2315. Count 1 charged a conspiracy by Cataldo, Lucas, and four other defendants Spiro Williams Halikas, Alan Irving Segal, William Fiske Wright, Jr., and Robert Bialkin to violate Sections 2, 371, 2314 and 2315. Counts 2 and 3 were substantive counts directed against Cataldo, Lucas, Halikas, Segal and Wright and alleged the receipt and sale of the stolen securities. Segal and Wright pleaded guilty; Halikas was convicted and did not appeal.

Little purpose would be served by a detailed account of the machinations of the conspirators in their ill-fated efforts to dispose of their booty. The facts, therefore, will be confined to a résumé of those relevant to their respective appellate arguments and somewhat enlarged as appropriate to each point.

On November 15, 1967, $488,000 worth of securities were stolen from the Los Angeles office of the brokerage firm of Rutner, Jackson and Gray. The certificates were all in the nominee name "RUTCO" of that firm. The certificates were sent to Miami and from there were mailed to Segal in New York. Segal then met with Cataldo, Lucas and Halikas to discuss the question of how to dispose of the securities. After several additional meetings, Cataldo directed Halikas in a series of actions designed to accomplish this end. After one effort to sell the securities proved unsuccessful, the securities were delivered to Schweickart and Company for sale. Unknown to the conspirators, Schweickart was the New York correspondent of Rutner, Jackson and Gray. Recognizing the "RUT–CO" nominee name, the firm investigated and discovered that the securities were the ones stolen from Rutner, Jackson and Gray. The F.B.I. then sought Halikas in order to arrest him. Agents appeared at his apartment and his roommate, Peter Costas, agreed to let them enter the apartment for the purpose of determining whether or not Halikas was there. He was not in fact there at the time. The agents checked again the next day. On both occasions, the agents entered Halikas' room, with Costas' consent, and saw in plain view certain documents which related to this crime, including a bank check used in furtherance of the conspiracy. On the basis of these observations, the agents obtained a search warrant. They then returned to the apartment for a third time, served the warrant and seized the papers.

[1] Defendant Lucas is also known as James Lucakos and was indicted as James Lucakas but apparently prefers the name Lucas.

Since guilt seems to be a secondary consideration to both appellants, their claims for reversal are limited. Cataldo objects to (1) a search of Halikas' apartment allegedly without authorization or consent and (2) inadequate instructions to the jury as to their consideration of Segal's credibility. Lucas challenges the insufficiency of the evidence as a matter of law.

### Cataldo

■■ Cataldo objects to the admission into evidence of papers seized by the F.B.I. in the course of the search of Halikas' apartment. We believe that the search and seizure was entirely justifiable. There is ample evidence to support the conclusion that the apartment was jointly occupied by Costas and Halikas as joint tenants and that Costas consented to the first two visits made to the apartment by the F.B.I. agents. Cataldo questions the authority of Costas to consent to an entry by federal agents into Halikas' room, since the evidence did show that Halikas and his co-tenant occupied separate bedrooms. Where, however, two or more persons occupy a dwelling place jointly, the general rule is that one joint tenant can consent to a search of the dwelling place. Carlton v. United States, 391 F.2d 684, 686 (8th Cir. 1968), cert. denied 394 U.S. 1014, 89 S.Ct. 1632, 23 L.Ed.2d 40 (1969); United States v. Kellerman, 431 F.2d 319 (2d Cir. 1970); United States v. Mackiewicz, 401 F.2d 219, 223–224 (2d Cir.), cert. denied 393 U.S. 923, 89 S.Ct. 253, 21 L.Ed.2d 258 (1968); Weaver v. Lane, 382 F.2d 251 (7th Cir. 1967), cert. denied 392 U.S. 930, 88 S.Ct. 2289, 20 L.Ed.2d 1390 (1968); Drummond v. United States, 350 F.2d 983, 989 (8th Cir. 1965), cert. denied sub nom., Castaldi v. United States, 384 U.S. 944, 86 S.Ct. 1469, 16 L.Ed.2d 542 (1966); Burge v. United States, 342 F.2d 408, 413 (9th Cir.), cert. denied 382

U.S. 829, 86 S.Ct. 63, 15 L.Ed.2d 72 (1965). The evidence here indicates joint control over the entire apartment.[2] This is not a situation such as Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) where a hotel guest occupied a room which was under lock and key and where the hotel manager who consented to the search was not jointly occupying the premises. In Frazier v. Cupp, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), the court decided that where two persons used the same duffle bag but each had his own compartment, the consent of one of the two users would be sufficient to justify the search of the entire bag. The court in *Frazier* found that the nonconsenting user "must be taken to have assumed the risk that [the consenting user] would allow someone else to look inside." Halikas here assumed a similar risk.

In view of the Costas consent, we find it unnecessary to decide whether the agents' examination of the premises on December 20 and 21, 1967 constituted a search on these occasions.

■ The Government has argued forcefully that under Alderman v. United States, 394 U.S. 165, 171–176, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), appellant Cataldo has no standing to challenge the constitutionality of the search of the Costas-Halikas apartment. Cataldo contends that the Government failed to raise this point at trial and thus waived the lack of standing argument; but it was the defendants who objected to the introduction of the evidence pursuant to the search warrant. During the trial and before receiving the challenged evidence, the trial Court gave the defendants ample opportunity to develop the facts relating to the alleged search and seizure. His conclusions that Costas' consent to the search was freely given, that Costas was a joint tenant of the

2. Halikas' roommate had a valid right to prove to the agents that he was not harboring a fugitive. This provides an additional justification for the agents' presence in the apartment. See United States v. Botsch, 364 F.2d 542 (2d Cir. 1966), cert. denied 386 U.S. 937, 87 S.Ct. 959, 17 L.Ed.2d 810 (1967), reh. denied 386 U.S. 987, 87 S.Ct. 1290, 18 L.Ed.2d 242 (1967).

apartment, and that the F.B.I. agent who entered Halikas' room did not touch or search anything therein are supported by the evidence and the law applicable thereto. Furthermore, Cataldo had no status as an occupant or co-tenant of the premises. At best he was only a friend of one or both of the occupants. The status of Cataldo as a co-conspirator did not give him a possessory interest in the papers seized and, therefore, he was not entitled to a reasonable expectation that they would be kept private. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L. Ed.2d 576 (1967); Mancusi v. De Forte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). We believe that the situation is clearly governed by Alderman v. United States, *supra,* and that Cataldo has no standing to challenge the search of the Costas-Halikas apartment.

As to the charge, Cataldo contends that the Court erred in failing to instruct the jury in the manner requested by defense counsel, as follows:

"[I]f they have a reasonable doubt as to the truthfulness of Segal's implication of Cataldo they should acquit Cataldo because there is no other evidence other than the version offered by the defendant or the witness Segal."

The Court reviewed Segal's unsavory record including his lying thrice to the Grand Jury and the F.B.I. on different occasions and his plea of guilty in this case and charged that the jury should "consider Segal's testimony with scrupulous care." United States v. Mattio, 388 F.2d 368, 370 (2d Cir.), cert. denied 390 U.S. 1043, 88 S.Ct. 1643, 20 L.Ed.2d 305 (1968); United States v. Agueci, 310 F. 2d 817, 833 (2d Cir. 1962), cert. denied sub nom., Guippone v. United States, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); United States v. Vita, 294 F.2d 524, 526 (2d Cir. 1961), cert. denied 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962). The defendants were entitled to no more. In addition to Segal, the jury saw and heard all three defendants who categorically denied any participation whatsoever in the crimes charged. The Court instructed that it was for the jury to determine his credibility in the light of his record. This they did—adversely to the defendants.

### Lucas

Lucas challenges his conviction on the grounds that there was insufficient evidence to support his conviction. We reject this argument. Although his share of the proceeds was to be smaller than the share others were to get, the fact that he was to get something indicates more than mere "generosity" as Lucas' counsel would have us believe. Lucas was also present at many meetings in which plans were discussed, bought "Nu-Skin" to hide Halikas' fingerprints and suggested bribing a New York Supreme Court clerk in order to get a blank certificate of doing business. These acts are sufficient to justify a jury verdict finding that Lucas participated in the conspiracy.

The convictions are affirmed.