**UNITED STATES of America**

**v.**

**Maria OREJUELA–GUEVARA, Louis Alvaro Betancourt-Sarria, Miguel Escobar-Montalvo and Patricia Munoz-Toxqui, Defendants.**

No. CR–86–00744.

United States District Court, E.D. New York.

May 8, 1987.

Cheryl Pollak, Asst. U.S. Atty., U.S. Dist. Court, Eastern Dist., Brooklyn, N.Y. for U.S.

Ray Rodriguez, Coral Gables, Fla., for defendants.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

In this case, defendants Maria Orejuela-Guevara ("Orejuela"), Miguel Escobar-Montalvo ("Escobar") and Louis Alvaro Betancourt-Sarria ("Betancourt") have moved to suppress quantities of cocaine and other evidence seized from their bedrooms in an apartment located at 142–38 Franklin Avenue, Queens, New York.[1] These seizures occurred after a written Consent to Search was executed by Hector Gallo-Moreno ("Gallo"), who occupied a separate bedroom in the same apartment. Gallo has not been charged. On February 13, 1987, an evidentiary hearing was held on defendants' motions to suppress and related applications.[2] For the reasons stated below, this Court has concluded that the motion of defendants Orejuela and Escobar to suppress the evidence found in their bedroom closet must be denied and that the motion of defendant Betancourt to suppress the evidence found in his bedroom closet must be granted.

In addition to the evidence discovered in the bedroom closets, a telephone book and a business card book were found on top of the bureau in Betancourt's bedroom. These items were admitted into evidence at the hearing and Betancourt's motion to suppress does not specifically challenge their introduction at trial. The suppression motions focus on the evidence seized from containers in the defendants' bedroom closets. To supplement and clarify the Court's oral findings and conclusions rendered at the hearing, this Memorandum Decision will address the issues presented by these applications, particularly the defendant Betancourt's attack on the third party consent.

## FINDINGS OF FACT

On the basis of the evidence presented, including the testimony of Special Agent Santiago and Detective Healey, which the Court credits, the Court makes the following findings of fact:

In the Fall of 1986, a homicide investigation was initiated following the murder of Hugo Rubio whose body was discovered in his car on a Queens Street. The circumstances surrounding the murder, including the presence of cocaine in the vehicle, suggested that the slaying was narcotics related. As a result, New York City detectives and federal agents collaborated in the investigation as part of Operation Redrum, an ongoing, joint investigative effort directed at the high number of drug-related homicides in certain Columbian communities in Queens County. The investigation into Rubio's death focused in part on a telephone number written on a scrap of paper found in the victim's vehicle. A check with telephone security revealed that the phone number was listed to a female customer, with an Hispanic name, at the apartment located on the second floor of

---

1. Following the Court's decision on the suppression motions, as it was rendered on the record on March 30, 1987, defendants Orejuela, Escobar and Patricia Munoz-Toxqui, the fourth defendant, plead guilty on March 30, 1987 to possession with intent to distribute a quantity of cocaine.

2. In addition to the suppression issues discussed here, the Court denied defendant Toxqui's motion to suppress the cocaine found in the white pocketbook she was carrying when she arrived at the apartment; her motion for severance; and defendant Betancourt's motion to suppress his post-arrest statements.

142–38 Franklin Avenue, Queens, New York.

Pursuing this lead, Redrum investigators established a brief surveillance on the house on the afternoon of November 6, 1986. At approximately 4:20 in the afternoon, a man later identified as Hector Gallo-Moreno entered the building. Minutes later, the five man investigative team followed, proceeding upstairs to the door of the second floor apartment where they listened momentarily before knocking. The door was eventually opened by defendant Maria Orejuela. Upon seeing the investigators, Orejuela turned toward Gallo who was seated at the dining room table. When Gallo came to the door, the men identified themselves and explained that they were investigating a homicide and wanted to show him some photographs and ask a few questions.

Without hesitation, Gallo motioned for the men to enter, and he directed them to the living room. Orejuela returned to the dining room where she rejoined approximately six adults and children, all of whom were guests, at the table. In the living room, just a short distance from the dining room, Special Agent Santiago acted as interpreter as Detective Healey showed Gallo a series of photographs. Gallo identified a picture of the murder victim, Rubio, commenting that he knew Rubio had been killed and that he believed Rubio had had some enemies—"'possibly from narcotics.'" Gallo explained that Rubio had been a customer in a restaurant where Gallo had worked and that Rubio had once invited him to invest in a Hilton Hotel in Columbia.

As Detective Healey concluded his brief interview of Gallo, Agent Santiago asked Gallo for identification. Gallo admitted immediately that he and others in the apartment were illegal aliens. He explained that he occupied one of the three bedrooms and that Maria Orejuela and her husband, who was not home at the time, shared a second, larger bedroom with the couple's small children.

Special Agent Santiago asked Gallo if there were any weapons or narcotics in the apartment. After Gallo assured the agents there was no contraband, Agent Santiago requested Gallo's consent to search the apartment. Gallo agreed. Agent Santiago produced a standard DEA Consent to Search form, written in Spanish, which he handed to Gallo. As Gallo took the form, Maria Orejuela entered the living room, sat down on the couch next to Gallo and appeared to look at the form as Agent Santiago explained it to Gallo. She said nothing.

Gallo signed the consent form. Before the search, Agent Santiago asked Orejuela where she slept, and she pointed out who lived in each room, including her own bedroom. The entire apartment was searched, including the three bedrooms. The doors to all three bedrooms were opened and unlocked. No contraband or incriminating evidence was found in the common areas of the apartment or in Gallo's bedroom.

The search of the two other bedrooms was more revealing. In Orejuela's bedroom, Detective LaSalla examined a walk-in closet and discovered an aluminum foil bag which was found to contain approximately one kilogram of cocaine. Orejuela denied knowing anything about the drugs. In Betancourt's bedroom, the detective, after finding the telephone and business card books discussed previously, searched a closet where he discovered a briefcase and a brown paper bag on a shelf. The unlocked briefcase was opened and found to contain a box of bullets and Betancourt's passport. The paper bag contained a clear plastic bag which itself contained a kilogram of cocaine. Defendants Betancourt and Escobar arrived home a short time later and were immediately placed under arrest. In the meantime, defendant Patricia Munoz-Toxqui was arrested when she entered the apartment carrying a handbag filled with approximately one kilogram of cocaine.

The facts, in and of themselves, are not seriously disputed. Rather, the defendants argue that an objective characterization of the facts vitiates the voluntariness of Gallo's consent and Gallo's authority to consent to the search of the defendants' bedroom closets.

## DISCUSSION AND CONCLUSIONS

The government may not intrude upon an individual's legitimate expectation of privacy without a warrant, unless the search falls within one of the narrowly drawn exceptions to the warrant requirement of the Fourth Amendment. *See Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958). Here, the government relies on the consent of a co-tenant, Hector Gallo-Moreno, to validate the warrantless search of the apartment. The government must prove, by a preponderance of the evidence, that the consent was freely and voluntarily given, *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973), and that the consenting party "possessed common authority over" or had "other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *United States v. Buettner-Janusch,* 646 F.2d 759, 764 (2d Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981).

The voluntariness of Gallo's consent is readily apparent. Based on all the facts established at the suppression hearing, there is "no evidence ... of coercion or other circumstances that would render the consent invalid." *United States v. Candella,* 469 F.2d 173, 175 (2d Cir.1972). Gallo invited the officers and agents into the apartment; he spoke with Agent Santiago in Spanish; the atmosphere in the apartment was relaxed and cooperative; those inside the apartment were permitted to move about freely; Gallo signed a consent to search form without hesitation or objection. No reluctance to cooperate with the investigation was displayed by Gallo at any time.

The focus of this Court's inquiry is whether Gallo had the requisite authority to consent to a search that extended to the closed containers that were found on shelves in Betancourt's and Orejuela's bedroom closets. Before examining the scope of Gallo's authority to consent to the search of the entire apartment, some preliminary issues must be addressed. Defense counsel have to some extent invited the Court's disapproval of the practice of the Redrum investigators to request consents to search on a relatively routine basis even when, as here, there was no basis for the agents to suspect criminal activity in the apartment by the residents or guests. Those aggrieved by the search assail this stab-in-the-dark methodology as inherently coercive and suspect. The point is troublesome and not easily rejected.

It has also been suggested that the Court reject the third party consent justification for the search of the Orejuela bedroom and impose on the agents under the facts of this case the affirmative obligation to secure Maria Orejuela's consent before searching her bedroom. As noted above, Maria was not only present in the apartment, she responded to the agents' inquiries concerning who slept in the bedrooms. Although securing Orejuela's consent would undoubtedly have been the better course to follow, the Court cannot conclude that this failure invalidates the search of her bedroom. The invitation to reject the government's reliance on the third party's consent becomes more attractive when one considers that the agents and detectives made no inquiry about Gallo's relationship to the residents of the apartment or the scope of his authority to consent to the unlimited search. They simply secured the consent from a six-month resident of the apartment and, without any further inquiry, launched a full scale search which took them into the bedrooms of people they did not suspect of criminal activity.

Given the long standing recognition the courts have given the concept of third party consent, absent compelling authority supporting these *per se* arguments, at least in concept, it is beyond the purview of this Court to promulgate or apply a proscriptive rule foreclosing the government's reliance on the Gallo consent. Instead, the impact of defendants' arguments must be computed in the Court's determination of whether the agents could have reasonably concluded that Gallo-Moreno had the sweeping au-

thority to consent to the limitless search. In any event, when the third party consent is relied upon and when the authorities have no evidence or suspicion of criminal activity and no knowledge of the people potentially affected or their relationship to the consenting party, it seems axiomatic, if not imperative, that special scrutiny be brought to bear in the analysis of these critical Fourth Amendment issues.

■ With this in mind, the Court has concluded that the search and resulting seizures in the Orejuela bedroom should be upheld. The government has met its burden of proving that the agents had a reasonable basis to conclude that Gallo had authority to permit that search. Maria Orejuela was in the apartment during the interview of Gallo, within earshot of the conversation. More importantly, when Agent Santiago broached the subject of the search of the apartment, according to the government's proof, Orejuela walked into the living room and sat down on the couch next to Gallo as he was presented the consent form. Although she said nothing, she appeared to be reading the form along with Gallo. She sat quietly as he signed the consent form. She then answered the agents' questions about who slept in each bedroom without any reluctance, protest or visible apprehension. And, as the search progressed to her own bedroom, she said nothing and she did nothing. Under these circumstances, it was reasonable for the officers and agents to conclude that Gallo not only had access to Orejuela's bedroom but had as well at least implied authority to permit the search. The Orejuela-Escobar motion to surpress must be denied.

The motion for defendant Betancourt presents a more difficult proposition requiring a closer examination. The analysis appropriately begins with *Matlock*. In *Matlock*, 415 U.S. at 164, 94 S.Ct. at 989–90, the Supreme Court addressed the scope of the third party consent principle as it applies to joint tenants. A woman with whom the defendant was living consented to the search of a bedroom they jointly occupied, and the proceeds of a bank robbery were found in a diaper bag in the only closet in the room. Significantly, the Court did not conclude that the couple's mutual use of the bedroom by itself justified her consent to the search. Instead, the Court remanded for a specific finding as to whether the woman's relationship to the bedroom was sufficient to make her consent valid against the defendant. *Id.* at 177–78, 94 S.Ct. at 996–97.

It was in this context that the Court penned its now oft-quoted footnote, observing that the validity of a third party consent

> ... rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-habitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7.

The *Matlock* standard is an objective one: the Court must determine whether the agents could have reasonably concluded, based on the facts as they appeared at the time the consent was given, that Gallo, through "mutual use" of the property, had the authority to consent to a search of the entire apartment, including the bedrooms of his co-tenants, the bedroom closets and the closed containers found there.

Application of the *Matlock* formula proves difficult because of the fact-bound nature of the inquiry. Further, the focal language in *Matlock* does not directly address the extent to which a co-tenant may retain certain spheres of privacy within a jointly occupied premises. Indeed, even before *Matlock*, courts regularly grappled with the third party consent issue. The results of those efforts, although at times apparently divergent, support the conclusion reached here that permission to search the Betancourt closet was beyond the authority of the consenting party Gallo.

A sampling of cases before and after *Matlock* is appropriate. The government relies on *United States v. Cataldo*, 433 F.2d 38 (2d Cir.1970), and correctly notes

that the decision applies "the general rule ... that one joint tenant can consent to a search of the dwelling place." *Id.,* at 40. In *Cataldo,* the Court observed without elaboration that "[t]he evidence here indicates joint control over the entire apartment." *Id.* (footnote omitted). The government's reliance on a "general rule," which this Court accepts without difficulty, does little to further the analysis required here.

A closer look at *Cataldo* is in order. FBI agents sought a suspect in a stolen securities case. They went to his home on two successive days looking for him. On both occasions his roommate, who had his own bedroom, permitted the agents *to enter* the suspect's room to verify his absence. On both occasions the agents saw incriminating documents in plain view, and prior to their third visit, they obtained a search warrant on the basis of these observations. In light of these facts, *Cataldo*'s allegiance to the general rule is understandable, but the case does not support the government's position. If the issue at bar concerned the agents mere entry into the bedrooms of Orejuela and Betancourt, this Court might likewise sanction the agents' conduct under the rationale of the general rule.[3] But the Redrum investigators went much further, far beyond the point where the general rule could offer them comfort, much less constitutional sanction.

The later decisions in this Circuit confirm this point. Following *Cataldo,* and in the wake of *Matlock,* the Second Circuit, in *United States v. Gradowski,* 502 F.2d 563, 564 (1974) (per curiam), established a standard for analyzing third party consent searches. The language of the *Gradowski* opinion has been adopted as the rule in the Second Circuit: "[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *Id.; See United States v. Buettner-Janusch,* 646 F.2d 759, 765 (2d

Cir.1981). In *Gradowski,* the third party consent was readily granted by a couple at whose house the defendant had left his car and his car keys. On these facts, the warrantless search of the automobile was upheld.

One month later, in *United States v. Pravato,* 505 F.2d 703, 704 (2d Cir.1974), Judge Oakes reflected on the "intriguing question—whether consent to search a room carries with it, willy-nilly, the right to search all the contents of the room." The issue did not have to be decided because the admission of the evidence discovered in the defendant's open suitcase was found to be harmless error.

Similarly, in *United States v. Isom,* 588 F.2d 858, 861 (2d Cir.1978), Judge Oakes, again confronted the "troublesome issue" of the scope of a third party consent. In considering the host's authority to consent to the forcible opening of a guest's locked metal box found under a bed, Judge Oakes acknowledged that "[i]f that box belonged to appellant, then he had a colorable Fourth Amendment interest in keeping its contents private." *Id.* Cautioning that a "justifiable expectation [of privacy] should not be vitiated by a strained application of the third-party consent doctrine," the *Isom* panel upheld the search by concluding that the police might reasonably have found that the appellant did not own the box and that the consenting party included it with the scope of the consent. *Id.* Although these cases did not have to reach the issue presented here, the decisions are important because they acknowledge the complexity of the determination once the search extends beyond the common areas of the jointly occupied premises and the need for layered analysis to identify and accommodate those areas entitled to independent constitutional protection.

In a more recent decision of the Second Circuit applying the *Matlock-Gradowski* standards, *Buettner-Janusch,* 646 F.2d at 766, the Court recognized that not all the

---

**3.** In a footnote, the *Cataldo* court also recognized an additional justification for the entry, observing that the roommate had the right to prove he was not harboring the suspect. *Id.,* at 40 n. 2 (citations omitted).

areas or containers in a room are equally private.

> If a specific area is in fact surrounded by an independent privacy interest, a government agent must either obtain a warrant to search it or is required to bring his examination within one of the exceptions to the warrant requirement. Thus, the Government may scrutinize even the most private enclosure if the third party has the authority to permit the intrusion. Here too, the third party's power to consent is to be tested under the familiar *Gradowski* standard.

*Id.*

The *Buettner-Janusch* Court held that even if the defendant professor had retained independent privacy interests in certain areas or containers in his laboratory, his lab assistants, who consented to the search, had access *and* at least implied permission to use everything in the laboratory, thereby satisfying both components of the *Gradowski* formula.

■ In light of the *Gradowski* standard as applied in *Buettner-Janusch*, the Court cannot conclude that Gallo's consent was sufficient to permit the introduction into evidence of the contraband and other items seized from containers in Betancourt's closet. It is not disputed that Gallo had physical access to Betancourt's room and the contents of the closet. The door to the bedroom was open at the time of the search, and there were no meaningful locks on the door to the bedroom or the closet.

The government, however, fails to satisfy the second prong of the *Gradowski* test. There is no evidence to support the conclusion that Gallo enjoyed either common authority over the contents of the closet or permission, express or implied, to exercise his access to the closet. Even if Gallo's consent were sufficient to validate entry into the bedroom or even the closet, under the *Buettner-Janusch* analysis, if the defendant has an independent, reasonable expectation of privacy in certain containers, then the *Gradowski* standard must be applied to each of the objects individually.

The defendant Betancourt had a legitimate privacy interest in both the bag and the briefcase. Common sense tells us that. Nevertheless the government contends, relying on *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), that because they were searching for guns and drugs, their search was only limited to areas in which these items might be hidden regardless of Betancourt's enhanced expectation of privacy in certain areas or containers. *Ross* does indeed confirm that "[w]hen a *legitimate* search is under way," Fourth Amendment jurisprudence forecloses "nice distinctions between closets, drawers, and containers." *Id.*, at 821, 102 S.Ct. at 2171 (emphasis supplied). But, the search must be "legitimate" and the test for constitutional legitimacy requires faithful adherence to the formula of *Matlock* and *Gradowski*.

■ The relevant authorities throughout the Circuits uniformly perceive the necessity in third party consent cases to undertake a detailed factual review of the relationship between the consenting party and the person aggrieved, including each person's relationship to the specific premises or area searched. Even when a close relationship between the individuals involved suggests a high level of implied authority, reviewing courts thoroughly screen all relevant facts to determine whether the consenting party in fact had that authority or whether the search invaded an area entitled to Fourth Amendment protection. *See, e.g., United States v. Harrison*, 679 F.2d 942 (7th Cir. 1982) (wife's consent to search boxes in basement storage area valid); *United States v. Block*, 590 F.2d 535 (4th Cir.1978) (mother had no authority to consent to search of footlocker in son's room); *Reeves v. Warden*, 346 F.2d 915 (4th Cir.1965) (mother had no authority to consent to a search of son's bureau drawer, even if there was some measure of shared access); *Cunningham v. Heinze*, 352 F.2d 1 (9th Cir.1965) (landlady, who had access to petitioner's room for housecleaning purposes, could not consent to search of bedroom and closet).

On the facts presented here, there is no need to enter the realm of "metaphysical subleties," *Frazier v. Cupp*, 394 U.S. 731,

740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969), because there are no facts to support the conclusion that Gallo had common authority over or an implied right of access to the containers in Betancourt's closet. The inspection of the bag and briefcase found on the shelf in Betancourt's closet cannot be validated by the controlling decisions addressing the doctrine of third party consent. The Court, after careful consideration, concludes that Gallo, as a joint occupant, did not have the authority to consent to the search of the containers found in the Betancourt closet. Nor was it reasonable for the agents and detectives to conclude that he did.

## CONCLUSION

Accordingly, the motion of the defendant Louis Alvaro Betancourt-Sarria to suppress the evidence seized is granted.

SO ORDERED.