## UNITED STATES of America

v.

## Luis Edwardo GONZALEZ ATHEHORTA and Hugo Valencia, Defendants.

### No. 89–CR–291.

United States District Court, E.D. New York.

Feb. 1, 1990.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y., for U.S., Burton Ryan, Asst. U.S. Atty., of counsel.

Ivan Stephen Fisher, New York City, for defendant Luis Edwardo Gonzalez Athehorta.

David Wikstrom Ely, New York City, for defendant Hugo Valencia.

## MEMORANDUM–DECISION AND ORDER

BARTELS, District Judge.

The defendants, Luis Edwardo Gonzalez Athehorta ("Gonzalez") and Hugo Valencia ("Valencia"), move to suppress all statements made to government agents at a motor vehicle stop and all physical evidence seized on April 11, 1989. Specifically, the defendants move to suppress (a) books and records, cocaine and U.S. currency seized following a third party consent search of an apartment at 3–12 126th Street in Queens; (b) statements made to government agents following the motor vehicle stop; and (c) currency seized from the automobile and the driver following the stop. An evidentiary hearing was held over the course of seven days in September and November of 1989.

## FINDINGS OF FACT

On the basis of the evidence presented, the following findings of fact are made:

On the evening of April 11, 1989, investigators from the New York State Police were conducting surveillance in the area of 126th Street in College Point, Queens. At approximately 5:30 p.m. Investigator Jose Rivera ("Rivera") observed a 1985 brown, two door Toyota drive up and park on 126th Street. Two hispanic men exited the car, removed a large weighted plastic bag from the trunk and entered an apartment building at 3–12 126th Street. The men appeared to conduct themselves in a "surveillance conscious" manner, i.e. constantly looking around to see if they were being followed or watched. A check of the automobile's license plate number revealed that it was registered to a Rafael Vasquez, date of birth "2/30/49", at 76–12 Roosevelt Avenue, Jackson Heights, Queens. Based on past experience, the investigators recognized the address as a "mail drop" used for the registration and insurance of vehicles used in narcotics trafficking.

At approximately 6:00 p.m. Rivera, now joined by Investigator Robert Rochler ("Rochler"), observed the two men who previously entered the building emerge empty handed, enter the Toyota and proceed to drive down 126th Street. The men were followed by Rivera and Rochler in one car and state agent Griffo in another. The occupants again behaved in a "surveillance conscious" manner and the driver committed traffic infractions when he failed to come to a full stop at a STOP sign along

126th Street and did not signal his intention to make a right turn onto the service road of the Whitestone Expressway. After observing these infractions agent Rochler, in an attempt to alert the driver of the Toyota to pull off to the side of the road, activated a siren and flashing lights. Rather than pulling off to the side the driver moved to the left and accelerated in an attempt to get on the ramp to the Expressway. Oncoming traffic prevented this and he was forced to pull off on to the shoulder.

Agents Rivera and Rochler, dressed in plain clothes and wearing clearly visible identification tags, approached the car and identified themselves as police officers. Their weapons, however, were concealed. While positioned alongside the passenger's window Rochler noticed a shiny object on the floor of the automobile near Valencia's foot. At Rochler's request, the passenger reached down and handed the object to him. The aluminum foil wrapped object contained a large quantity of U.S. currency. Simultaneously, Rivera, addressing the driver in Spanish, asked him for his license and registration, at which time the driver reached inside his jacket, which appeared to contain a large bulge. Fearing that the driver was reaching for a weapon, Rivera grasped his arm, withdrew it from the jacket and asked him to step out of the car. During the course of a routine pat down three bundles, containing U.S. currency, fell out of Gonzalez's jacket. The four packages seized contained approximately $65,000.00 in U.S. currency.

In response to Rivera's question as to whose money it was, Gonzalez said that it wasn't his and he [Rivera] could do what he wanted with it. (SH 475–476).[1] Rivera renewed his request for identification and Gonzalez produced his Massachusetts drivers license and a registration card in another person's name. Gonzalez told Rivera that he borrowed the car from a friend. He falsely identified his passenger and told Rivera that they were just driving around. He also said he was an illegal alien from Colombia and he had been in New York for two days and was staying in a motel, but that

he did not know its name. Gonzalez also told Rivera that he worked for a Colombian magazine, however, he did not know the name of the magazine or the telephone number at his place of employment. (SH 477–478). Rivera also questioned the passenger who, although properly identifying himself, denied any knowledge as to the origin or ownership of the money. Rivera asked each man individually how they acquired the money and both continued to respond evasively. After approximately 15 minutes of this line of questioning Rivera read the defendants their *Miranda* rights and told Valencia that they were not under arrest. (SH 84, 482, 489–490).

In the interim, Senior Investigator Velez ("Velez") arrived at 126th Street to continue the surveillance. Velez observed another male suspect leave the first floor apartment of 3–12 126th Street at approximately 6:50 p.m. and enter an Oldsmobile with Massachusetts license plates. Velez followed the suspect, stopped him and asked for identification. The man produced a Massachusetts drivers license and falsely identified himself as "Rodrigo Sarmiento".

At this juncture Rochler advised Velez, over the car radio, that the Toyota had been stopped and a large quantity of U.S. currency found. Based on this information, the "Sarmiento" stop, and the fact that the car was registered to a known "mail drop" used by narcotics traffickers Velez and another officer decided to approach 3–12 126th Street, the building Gonzales and Valencia were earlier seen entering and leaving. After gaining entry to the vestibule Velez knocked on the door to the first floor apartment. At first there was no response and Velez then knocked on the window of the first floor apartment. The door was then opened by a young woman, Livia Mejia ("Mejia"). Velez identified himself as a police officer and asked if he could enter the apartment. Mejia consented and Velez entered the living room at approximately 7:15 p.m. Following a brief conversation with Velez, which was interrupted several times because Mejia had to go to the kitchen to attend to her

---

**1.** Numerical references are to the transcript of the suppression heearing.

cooking, Mejia verbally authorized a search of the apartment and subsequently executed a standard Consent form ("Consent"), printed in the Spanish language.

Mejia, a 25 year old chambermaid, testified that she met Gonzalez in Boston in 1987 and lived with him for a short time in 1988 in an apartment in Winthrop, Massachusetts. They separated in April 1988, and in July she and her sister moved into an apartment in Revere, Massachusetts, where she has been living ever since. In October of 1988, she resumed her relationship with Gonzalez but they did not live together. In February and March of 1989 she came to New York for a few days and stayed with Gonzalez. There was no evidence offered as to where she and Gonzalez stayed on those occasions. She arrived in New York on April 1, 1989, at the invitation of Gonzalez, her paramour, and went directly to his apartment at 3–12 126th Street. She brought with her some, but not all, of her clothing and some personal papers, including employment references. Mejia did not resign her job with Massachusetts General Hospital when she came to New York on this last trip. She had spent a total of seven nights in the apartment when she and Gonzalez returned to Boston on April 8, 1989. After a three day stay in Boston, they returned to the Gonzalez–Valencia 126th Street apartment on April 11, 1989, the very day Mejia authorized the search of the apartment.

At Velez's request for identification Mejia entered the master bedroom and produced a Massachusetts drivers license, stating her address as "502 Beach Street, No. 1, Revere, Massachusetts" and a Colombian passport. Velez testified that he asked Mejia "where in Massachusetts did she live," and she responded "502 Beach Street, Revere, Massachusetts." (SH 156). Velez also testified that Mejia told him that she and Gonzalez paid $800.00 a month rent for the apartment at 126th Street. (SH 157). As a matter of fact, rent receipts bearing Hugo Valencia's name and showing that he paid the rent were seized by the agents during the search. Finally, she said there was nothing illegal, such as guns or drugs,

in the apartment and that Velez could look around and see for himself. (SH 158).

Mejia testified a little differently. She told Velez that she lived at the 3–12 126th Street apartment, that Luis, her boyfriend, and Hugo, his friend, (Gonzalez and Valencia, respectively) lived with her. She also told Velez that she had been there only a little over a week, while her boyfriend had been living there over one month. (SH 154, 158). She denied telling Velez that she paid any portion of the rent for the 126th Street apartment or how much the apartment rental was. (SH 628). Mejia also testified that Velez never asked her about the Massachusetts address on her drivers license. (SH 622). Velez never asked Mejia to produce the apartment lease or any other evidence to corroborate the fact that she and Gonzalez were sharing the rent. Nor did he question her about her relationship with Valencia. (SH 218–219). She testified that she kept none of her belongings in Valencia's room but occasionally she went in there to take the cordless phone out of his room. (SH 651). In response to the Court's questions Mejia said that she did not pay any bills. (SH 641).

Valencia signed the lease for the apartment at 3–12 126th Street on March 23, 1989, and moved in on March 25, 1989. (SH 717). As regards his relationship with Mejia, Valencia told the Court that prior to April 1, 1989, he had met her only once before at a discotheque. As regards Mejia's relationship to the premises he said that she lived there for seven days while she was visiting Gonzalez, and based on what he had been told she had not moved in permanently. Her name was not on the door and she received no mail at that address. (SH 717, 720). Valencia also testified that he never authorized Mejia to consent to a search of his bedroom. (SH 717).

Gonzalez testified that he moved into the apartment on March 25, 1989, and he and Valencia shared the $800.00 rent equally. (SH 655). He also told the Court that he never gave Mejia authority to consent to a search of the master bedroom.

Having had an opportunity to evaluate the credibility of the witnesses, under all

the circumstances, the Court credits Mejia's testimony to the effect that she never told Velez that she paid any portion of the rent, and also Gonzalez's testimony that he and Valencia shared the rent, and never authorized Mejia to consent to a search of the apartment. It does not seem credible that this young woman, who was employed as a chambermaid and was maintaining an apartment in Massachusetts with her sister, would tell the officer that she paid part of the rent for her boyfriend's apartment.

Velez assigned several agents to search the apartment after Mejia executed the Consent. At that time Velez understood that the small bedroom belonged to Valencia and the larger bedroom to Gonzalez. (SH 239–240). Approximately $9,000. wrapped in aluminum foil was discovered in the freezer in the kitchen. A notebook, allegedly documenting narcotics transactions, was found between the mattress and the boxspring of the bed in Valencia's bedroom. In the closet in the master bedroom the agents found approximately $5,000 wrapped in rubber bands on the top shelf and a cardboard carton containing ten kilos of cocaine on the floor.

The condition of the cardboard carton at the time it was seized and searched is disputed. Gonzalez and Valencia testified that they picked the carton up on the afternoon of April 11, 1989, and that when they received the carton it was sealed across the top and bottom with tape. (SH 660, 717). Gonzalez said he carried the sealed carton into the apartment, put it in the closet in his (the master) bedroom, and placed some empty briefcases and a bag of shoes on top of it. (SH 663–664). Investigator Alston testified that when he discovered the carton in the corner of the closet there was no tape on it, its flaps were standing open and the contents clearly visible. (SH 277–278). Rochler testified that he saw the carton while it was in the closet and it was open, with no top on it. (SH 102). The carton was introduced as evidence at the hearing

and at that time there were three different kinds of tape on the carton.[2] By way of explanation, government witnesses said that all the tape was applied by various officials who handled the box after it was seized from the apartment and turned over to the evidence custodian. On this point, the Court lacks confidence in the credibility of the government witnesses. It is not credible that men, schooled in the art of narcotics trafficking, would fail to take even the simplest precaution of closing the flaps of a carton that contained such incriminating and valuable evidence.

Locks were not found on either of the bedroom doors or the closet in Gonzalez's bedroom. Personal effects belonging to Mejia were found in the closet and in a dresser in the master bedroom.

Following the discovery of the cocaine Velez ordered Rivera, by phone, to arrest the defendants. The defendants were then arrested and escorted back to the apartment where another officer read them their Miranda rights a second time.

## DISCUSSION

### I

### *The Motor Vehicle Stop*

The defendants argue that they were stopped without reasonable suspicion and subjected to custodial interrogation without the proper Miranda warnings.

The Vehicle and Traffic Law[3] requires an operator of a motor vehicle to produce a registration certificate and driver's license upon a police officer's request. "Stopping a car for this purpose violates Fourth Amendment standards when done for reasons which are 'gratuitous, arbitrary, and without justification or excuse', but not when the police officer reasonably suspects that a violation of the VTL has occurred." *United States v. Barnes*, 443 F.Supp. 137, 142 (S.D.N.Y.1977); *citing*

---

**2.** The Court believes it is also appropriate to note that the carton was accidentally misplaced or destroyed while it was in the United States Attorney's possession. Consequently, it was not available for the November portion of the hearing and would not be available at trial.

**3.** *See* N.Y. Vehicle and Traffic Law § 401(4) (McKinney 1986).

*People v. Ingle,* 36 N.Y.2d 413, 414, 418, 369 N.Y.S.2d 67, 330 N.E.2d 39 (1975). The facts in the *Barnes* case, in which the district court concluded that the automobile stop was neither arbitrary nor without justification, are remarkably similar to the instant case. In both, the automobiles were in areas of known narcotics trafficking and the vehicles were stopped after officers observed the driver commit traffic infractions.

Moreover, "[i]t is well settled that a law enforcement officer may, in certain circumstances, stop and question an individual to investigate possible criminal behavior where the officer has a reasonable suspicion, based on specific, objective, and articulable facts, that the individual is involved in criminal activity." *United States v. Delos-Rios,* 642 F.2d 42, 45 (2d Cir.), *cert. denied,* 451 U.S. 941, 101 S.Ct. 2024, 68 L.Ed.2d 330 (1981); *citing Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979); *Terry v. Ohio,* 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *United States v. Gomez,* 633 F.2d 999, 1004 (2d Cir.1980), *cert. denied,* 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Buenaventura-Ariza,* 615 F.2d 29, 33 (2d Cir.1980). To determine whether the facts relied upon by the officer support a reasonable suspicion the circumstances surrounding the stop must be viewed "as a whole, not as discrete and separate facts" and "through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *Id.* (citations omitted). In the instant case the defendants were observed in an area of known narcotics trafficking, their movements were consistent with those of individuals behaving in a surveillance conscious manner, the vehicle they were driving was registered to an address known to be used by narcotics traffickers, and they attempted to elude the officers by entering the expressway. Viewed through the eyes of a seasoned officer, these facts amply support the reasonableness of the agents' suspicions of criminal activity and the subsequent stop of the vehicle.

"The solicitation of information concerning a person's identity and background does not amount to a custodial interrogation prohibited by *Miranda v. Arizona,* whether that solicitation occurs before, or after Miranda warnings are given." *U.S. v. Adegbite,* 846 F.2d 834, 838 (2d Cir.1988) (citations omitted). Rivera's initial questions regarding the defendants identity, nationality, alien status, employment and residence were within the scope of permissible inquiry based on his suspicions of criminal activity. Furthermore, the questions related to the ownership of the large amounts of currency were reasonable under the circumstances. Miranda rights were timely administered to the defendants after they repeatedly refused to answer Rivera's questions concerning their residence, destination and ownership of the money. Consequently, defendants' statements should not be suppressed.

Furthermore, pursuant to a legitimate investigatory stop of an automobile a police officer may request that the occupant exit the vehicle even if he lacks particularized reason to believe the occupant is armed. *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977); *New York v. Class,* 475 U.S. 106, 115, 106 S.Ct. 960, 966, 89 L.Ed.2d 81 (1986). This principle has its roots in the long accepted belief that police officers should not be subject to unnecessary risks in the performance of their duties. *Terry v. Ohio,* 392 U.S. at 23, 88 S.Ct. at 1881. A natural sequela of this principle is that the police officer is justified in conducting a limited protective search, i.e. a pat down, if he reasonably suspects that the person he has legitimately stopped is armed. *Id.* at 29, 88 S.Ct. at 1884; *Pennsylvania v. Mimms,* 434 U.S. at 111–112, 98 S.Ct. at 333–34.

The officers in both *Mimms* and the instant case became suspicious when they noticed a "bulge" in the jacket of one of the vehicle's occupants. "The bulge in the jacket permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer. In these circum-

stances, any man of 'reasonable caution' would likely have conducted the 'pat down'." *Id.*

### Currency Seizure

Having found that the motor vehicle stop and preliminary questioning of the defendants was proper it is necessary to resolve the defendants motion to suppress the currency seized from the interior of the automobile as well as that seized following the pat down of the driver. For the sake of clarification, it should be noted that the evidence seized at the motor vehicle stop is not fruit of the poisonous tree since the search took place prior to the apartment search.

At the outset the Court questions Valencia's standing to raise a Fourth Amendment challenge as to the currency seized at the motor vehicle stop because first he must demonstrate that he had a legitimate expectation of privacy in the area searched or the items seized. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Smith*, 621 F.2d 483, 486 (2d Cir.1980), *cert. denied*, 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981); *United States v. Rivera*, 465 F.Supp. 402, 411 (S.D.N.Y.1979), *aff'd*, 614 F.2d 1292 (2d Cir.1980). In *Rakas*, where the defendants were passengers in a lawfully stopped car the Court found that they "made no showing that they had any legitimate expectation of privacy in ... the area under the seat of the car in which they were merely passengers." *Rakas v. Illinois*, 439 U.S. at 149, 99 S.Ct. at 433.

■ In *Rakas, Smith*, and *Rivera* the defendants, passengers in the vehicle stopped, lacked standing to raise a Fourth Amendment claim because they each denied ownership of the vehicle as well as ownership of the articles themselves. In the instant case, Gonzalez and Valencia told the agents that the car belonged to another person, Valencia was merely a passenger, and he unequivocally and repeatedly denied any knowledge as to the origin or ownership of the currency. From these circumstances it is clear that Valencia lacks standing to challenge the search of the interior of the vehicle, i.e. the floor in front of the passenger seat. *See Arkansas v. Sanders*, 442 U.S. 753 at 761 n. 8, 99 S.Ct. 2586 at 2592 n. 8, 61 L.Ed.2d 235 (1979) (where the respondent conceded that the suitcase in question was his property there was no doubt that he had standing to challenge the search). The Court also notes that Valencia voluntarily surrendered the package on the floor in front of his seat when Rochler questioned him about it. As to Gonzalez, although he was not a passenger he did not own the vehicle and when he was questioned regarding the package of currency he too said that it was not his. Based on the statements he made at the time it is apparent that he had no legitimate expectation of privacy in an article he did not own.

■ Another batch of currency was seized during the pat down of Gonzalez. Each defendant objects to this search. Gonzalez's claim is baseless as the evidence was seized during a legitimate circumscribed Terry pat down conducted by Rivera when he became concerned that the bulge in Gonzalez's jacket was a weapon. Furthermore, he disavowed any knowledge as to the ownership of the money and told the agent "... do what you want with it." Valencia lacks standing to challenge the search because he has no legitimate expectation of privacy in the search of another person. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (defendant had no legitimate expectation of privacy in another individuals purse, in which he had placed his drugs, therefore, no standing to challenge search). In addition he denied any interest in the currency seized. Therefore, the Court denies defendants' motion to suppress the evidence seized during the motor vehicle stop.

## II

### The Apartment Search
### Third Party Consent

In this instance the government relies on the consent of a third party, Livia Mejia, to validate the warrantless search. While the voluntariness of Mejia's consent is not con-

tested her authority to consent to a search of the apartment is. The government concedes that neither Valencia nor Gonzalez ever authorized Mejia to permit a search, therefore, she had no actual authority to consent to a search of the premises. They argue, however, that she possessed apparent authority. Alternatively, the defendants argue that Mejia was a visitor who had no control of the apartment and consequently she lacked even apparent authority to consent to the warrantless search. Therefore, the threshold issue confronting the Court is whether Velez could have reasonably concluded, based on the facts as they were known at the time Mejia's consent was obtained, that she had apparent authority to consent to an unlimited search of the premises. *See United States v. Orejuela–Guevara*, 659 F.Supp. 882, 886 (E.D. N.Y.1987). Ultimately, in deciding this question the Court evaluated the credibility of two key witnesses, Velez and Mejia, who gave very divergent accounts of significant events.

■ It is well established that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that common authority is shared. *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). The Court observed that common authority

> rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 172 n. 7, 94 S.Ct. at 993 n. 7 (1974). The consenting party need not have actual authority; apparent authority to consent is sufficient. *Buettner–Janusch*, 646 F.2d 759 at 765 n. 7 (2d Cir.), *cert. denied*, 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981).

In *Matlock* the Supreme Court concluded that mutual use of a bedroom by an unmarried couple was not dispositive of the question of whether the woman's consent to search was valid. The Court remanded the case with instructions that the district court make a specific finding as to the nature of the relationship of the individual giving consent to the premises searched, i.e. the shared bedroom was sufficient to make her consent valid as against the defendant. *United States v. Matlock*, 415 U.S. at 177, 94 S.Ct. at 996; *construed in United States v. Orejuela–Guevara*, 659 F.Supp. at 886.

In *Matlock's* wake, this Circuit has repeatedly held that "[1] consent to a search by one with access to the area searched, and [2] either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Gradowski*, 502 F.2d 563, 564 (2d Cir. 1974) (per curiam) (consent to search car valid where consenting party was in possession of car and keys); *United States v. Buettner–Janusch*, 646 F.2d at 765 (consent valid where consenting party was a co-worker who had been given keys to the area searched and standing permission to use the premises); *United States v. Pravato*, 505 F.2d 702, 703 (2d Cir.1974) (consent valid where the consenting party was the owner of a single family home in which the objecting defendant was a non paying guest for three days); *United States v. Isom*, 588 F.2d 858, 860 (2d Cir.1978) (consent valid where consenting party was the lawful tenant of the apartment); *U.S. v. Trzaska*, 859 F.2d 1118, 1120 (2d Cir.1988) (consent valid where consenting party, the estranged wife of the defendant, possessed a key to the premises and was on the premises to remove her personal belongings).

■ In the above cases the Court is impressed by the obvious presence of a significant possessory interest of the consenting party in the premises searched. The individual who possesses the keys to the automobile clearly has an exclusive possessory interest in the vehicle. Likewise, the homeowner or legal tenant exercises complete if not exclusive control over the premises. Inasmuch as Valencia signed the lease for the apartment and he and Gonzalez alone

paid the rent, they, and not Mejia, possessed the dominant and controlling interest in the premises, 3–12 126th Street. The fact that Gonzalez invited Mejia, his girlfriend, to spend some time in the apartment, as his guest, does not support the conclusion that Valencia or Gonzalez assumed the risk that she would permit a warrantless intrusion of their home.

A warrantless search of a bedroom closet authorized by the woman who lived with the defendant and shared the closet was upheld in *United States v. Richardson*, 562 F.2d 476, 479 (7th Cir.1977). It is significant to note, however, that in that case the apartment was leased in the name of the woman who authorized the search. The Eighth Circuit has recently examined the same problem and concluded that a girlfriend who resided with the defendant could consent to a search of their shared premises because she rented the house, paid the rent and her name appeared on the mailbox and lease. *U.S. v. Bradley*, 869 F.2d 417, 419 (8th Cir.1989). Clearly such is not the instant case. Critical elements the courts relied on in validating third party consents, i.e., consenting party either leased or paid rent for premises searched, are notably absent in this case.

It is important to note that the Fifth Circuit, in *Moffett v. Wainwright*, 512 F.2d 496, 499 (5th Cir.1975), held that a warrantless search of defendant's apartment, consented to by three women who told the officer that they lived in the apartment, was invalid. In that case the officer testified that the women told him that the apartment was their home, but he had no knowledge of the "girls' authority or their rights to the premises." *Id.* Moreover, he stated that he did not know who had rented the apartment but based on the fact that they had all their clothes in the house he concluded they had moved in. Velez had less knowledge upon which to base his conclusion than did the officer in *Moffett*. He relied on Mejia's statement that she was Gonzalez's girlfriend and that she was living in the apartment with him. He had no independent knowledge of her authority nor did he know whether she had brought all her clothes with her. Moreover, he

knew that she had been there only a few nights and he was on notice that she had a residence in Massachusetts.

It is well recognized that "[c]onsent to a search is not to be lightly inferred, but should be shown by clear and convincing evidence." *Id.*, *quoting Phelper v. Decker*, 401 F.2d 232, 236 (5th Cir.1968). Velez testified that because he believed that Mejia had control over the apartment it wasn't necessary to obtain the defendants' consent to search or to inquire further. (SH 216). The basis for his conclusion was the fact that she told him that she lived in the apartment and paid part of the rent, was cooking during their conversation and went into the bedroom to get her identification. (SH 216). Inasmuch as the Court finds that Mejia did not tell Velez she paid any portion of the rent it discounts that factor. Moreover, the fact that Mejia was cooking something in the kitchen while Velez talked to her was natural and adds little support to the argument that she possessed the requisite authority to consent to an unlimited search of the entire apartment. Although Mejia told Velez that she lived in the apartment, she also told him that she had been staying there a very short time, a little over a week. This, juxtaposed with the fact that the identification she produced revealed a Massachusetts address, undercuts the strength of that prong of Velez's argument. The government has not met its burden of proof in demonstrating that Mejia had either actual or apparent authority to consent to a search of the apartment.

The government argues that Velez did all that was reasonable under the circumstances to ascertain whether Mejia had the requisite authority to consent. The Court disagrees. This is a situation where "the facts known by the police cry out for further inquiry, and when this is the case it is not reasonable for the police to proceed on the theory that 'ignorance is bliss'." 3 W. LaFave, *Search and Seizure*, § 8.3(g) (2d ed.1987). Velez opted to remain ignorant rather than ask a few pertinent questions that could have clarified the situation. For instance, Velez never asked Mejia to show

him a copy of the lease or rent receipts to corroborate her alleged statement that she and Gonzalez paid the rent. Finally, the Court notes that he did not even attempt to obtain a telephone warrant. The Court does not wish to condone police practices such as this, especially where the sanctity of a fundamental constitutional right is at stake.

Although Mejia had access to the area searched, thereby satisfying part one of the *Gradowski* test, no reasonable person could conclude, based on the facts known to Velez at the time, that she had either common authority over the area, a substantial interest in the area or express or implied permission to exercise access to the area. Consequently, the second part of the *Gradowski* test is not satisfied and the third party consent is invalid. For the aforementioned reasons the Court finds that Mejia had neither actual nor apparent authority to consent to a search.

The Court is not insensitive to the Supreme Court's admonition to avoid the realm of metaphysical subtleties with respect to evaluating the efficacy of third party consents. *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969). In *Frazier,* the Supreme Court rejected defendant's argument that the third party lacked authority to consent to a search of the entire duffel bag because he had permission to use only one compartment. Officer Velez need not have entered the realm of metaphysical subtleties in this situation as he could easily have ascertained the boundaries of Mejia's authority by asking a few simple questions.

Exceptions to the warrant requirement of the Fourth Amendment are narrowly drawn. This fundamental right can not be eroded simply because the government seeks to take the path of least resistance by obtaining consent from an individual whose interest in the premises searched is obviously vague and attenuated.

*The Cocaine*

■ The cocaine was discovered following the search of a sealed container. Such a search is not permitted if it violates the owner's legitimate expectation of privacy.

To determine if an individual has a legitimate expectation of privacy in a particular container the Court is guided by the principle enunciated in *Arkansas v. Sanders,* 442 U.S. 765 n. 13, 99 S.Ct. 2593 n. 13, that

[n]ot all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus some containers (for example, a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents will be open to "plain view," thereby obviating the need for a warrant.

*Id.* at 755.

Inasmuch as the Court found that the cardboard carton was not open when Investigator Alston discovered it, the "plain view" rationale is inapplicable. Furthermore, in a recent decision this Circuit ruled that evidence seized from several containers discovered in a search of a fume hood was admissible because the agents could "properly infer that they contained methaqualone from their outward appearance." *Buettner–Janusch,* 646 F.2d at 766–767. However, this Circuit has held that marihuana seized from a sealed cardboard carton (found in a van that was validly searched without a warrant) was inadmissible because the contents of the cartons could not be inferred from their outward appearance. *United States v. Dien,* 609 F.2d 1038, 1045 (2d Cir.1979), *adhered to,* 615 F.2d 10 (1980). The officers could not have inferred, merely from an examination of the outward appearance of this ordinary looking closed carton, that it contained narcotics or evidence of other illicit activity. Consequently, the evidence must be suppressed.

*The Books and Records*

Even if the Court found that Mejia had either actual or apparent authority to consent to a search of the apartment, one cannot assume that her authority supported an unlimited search of the entire premises. The scope of a third party consent must be analyzed. *United States v.*

*Isom*, 588 F.2d at 861; *United States v. Buettner–Janusch*, 646 F.2d at 765–766; *United States v. Orejuela–Guevara*, 659 F.Supp. at 887. Accordingly, the Court must determine if the agents could have reasonably concluded that Mejia had the authority to consent to the unlimited search of all the premises or whether the joint occupants still retained certain zones of privacy.

■ The consent of a joint tenant who occupies one of the bedrooms in an apartment is not sufficient to justify the warrantless search of the bedroom of another joint tenant if there is no evidence that the consenting joint tenant enjoyed either common authority over the contents of the bedroom or permission, express or implied, to exercise access to the bedroom. *See United States v. Orejuela–Guevara*, 659 F.Supp. at 888. There a cotenant of many months duration, who had access to the bedrooms of his other cotenants because of the absence of any meaningful locks on the doors, nonetheless lacked apparent authority to consent to a search of his cotenants bedrooms. Specifically, the court found there was insufficient evidence to conclude that he enjoyed common authority over the contents of the closet or express or implied permission to exercise his access to the closet. *Id.*

■ Similarly, in this case, the government has not presented sufficient evidence to support the conclusion that Mejia enjoyed either common authority over the contents of Valencia's bedroom, or permission, express or implied, to exercise her access to the room. Velez made no attempt to ascertain the relationship between Valencia and Mejia. The undisputed testimony is that Mejia was not authorized to use Valencia's bedroom and she entered occasionally for the sole purpose of using the cordless telephone. Mejia clearly had neither actual nor apparent authority to

consent to a search of Valencia's bedroom, therefore, the defendants' motion to suppress the evidence seized from that room would still be granted.

## The Currency

■ Assuming, *arguendo*, that the third party consent is valid, the currency seized from the kitchen freezer and the master bedroom closet must nevertheless be suppressed. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. Hew Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971). The warrantless seizure is permitted if, at the time the object is observed, the following conditions are met: (a) The officer is lawfully on the premises; (b) the discovery is inadvertent; and (c) the incriminating nature of the object is immediately apparent. *Id.* at 465–474, 91 S.Ct. at 2037–2042. The incriminating nature of an object is immediately apparent if the police have probable cause to believe it is evidence of a crime, *United States v. Ochs*, 595 F.2d 1247, 1258 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979); *United States v. Grubczak*, 793 F.2d 458, 461 (2d Cir.1986), but if an item must be moved even slightly, to ascertain its incriminatory nature the third requirement of the plain view doctrine is not satisfied. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

■ Assuming the officers were legitimately present on the premises and the discovery was inadvertent[4] the currency discovered in the freezer and the closet in the master bedroom is inadmissible because its incriminatory nature was not immediately apparent. Common sense would lead one to conclude that aluminum wrapped packages discovered in the freezer[5] contained food rather than contraband

---

4. A discovery is inadvertent if the officer does not "know in advance the location of [specific] evidence and intend to seize it." *Coolidge v. New Hampshire*, 403 U.S. at 470, 91 S.Ct. at 2040. The Court acknowledges that the officers had no advance knowledge of the fact that there

was currency in the freezer or in the bedroom closet.

5. The Court notes, with interest, that Senior Investigator Velez testified, that in his opinion, the money wrapped in aluminum foil found in the freezer was concealed. (SH 244). The

or evidence of illegal activity. Moreover, the package had to be removed from the freezer and unwrapped before the officers could determine the nature of its contents, i.e. whether it was evidence of criminal activity.

 Likewise, the incriminating nature of the currency found on the top shelf of the closet was not immediately apparent either. The Court reaches this conclusion based on its finding that the cocaine and alleged drug records were illegally seized. Without this evidence there is no support for a finding that there was probable cause to believe that the currency was evidence of criminal activity. Clearly, the plain view doctrine is not available to support the seizure of currency from either the freezer or the bedroom closet.

## CONCLUSION

In view of the foregoing the defendants' motion to suppress all the evidence seized from the apartment at 3–12 126th Street, i.e. the cocaine, the books and records, and the currency is hereby granted. However, the Court denies defendants' motion to suppress statements made to agents and evidence seized at the motor vehicle stop.

Court infers, therefore, that Velez believes that the evidence was not in "plain view".