**UNITED STATES of America,**

v.

**Freddy ROJAS, Humberto Llanos, and Armando Mosquera, Defendants.**

No. 95 CR 234 (JG).

United States District Court,
E.D. New York.

Nov. 1, 1995.

122

Zachary Carter, United States Attorney, Eastern District of New York by Elaine Banar, Assistant U.S. Attorney, Brooklyn, New York, for U.S.

Jose O. Castaneda, Port Chester, New York, for Fred Rojas.

Russell Carbone, Malerba, Carbone & La Sala, Kew Gardens, New York, for Humberto Llanos.

Paul Testaverde, Elmhurst, New York, for Armando Mosquera.

*MEMORANDUM AND ORDER*

GLEESON, District Judge:

Freddy Rojas, Humberto Llanos and Armando Mosquera are charged in a two-count indictment with conspiring to distribute and to possess with intent to distribute cocaine (Count I) and with possessing cocaine with intent to distribute (Count II). All the defendants have moved to suppress evidence. For the reasons set forth below, the motions are denied, except with respect to the statements elicited from Mosquera after the discovery of narcotics in his apartment. To that limited extent, Mosquera's motion is granted.

*The Facts*

On March 7, 1995, agents, detectives and investigators assigned to the Eldorado Task Force were conducting surveillance in the vicinity of 20–46 31st Street, Long Island City, New York ("the 31st Street location"). The surveillance was initiated as a result of confidential information provided to the Task Force. The subjects of this surveillance were the defendant Freddy Rojas and a blue Chrysler Caravan. (July Tr. at 14.)[1]

On two or three occasions, Rojas was observed exiting the 31st Street location to use a pay phone on a nearby street corner. At approximately 2:30 p.m., Rojas left the 31st Street location again and walked toward 20th Avenue. He was seen meeting and speaking with the driver of a gray van, who was later identified to be the defendant Humberto Llanos. After speaking briefly with Llanos, Rojas got into his blue Caravan and drove it away, following the gray van driven by Llanos. (July Tr. at 16.)

The two vans drove to 48th Street. Rojas parked his blue Caravan, got out of it and got into the gray van driven by Llanos, only to go just one more block, where they parked in the vicinity of 30–70 48th Street ("the 48th Street location"). (July Tr. at 17.)

Llanos exited the gray van and entered the 48th Street location. Rojas remained in the gray van. Llanos soon returned to the van and drove in it (with Rojas) a short distance to an international telephone-calling location near Broadway and 45th Street. Both Llanos and Rojas entered the location, and after several minutes both came out and re-entered the gray van. They thereupon drove a short distance to another international telephone-calling location, named Macarina's, on Whitney Avenue near Broadway. Again, both entered the location, and after approximately 15 minutes both re-entered the van and drove to yet a third international telephone-calling location, this one in the vicinity of Roosevelt Avenue and 85th Avenue. Both subjects entered the location, and after several minutes exited, re-entered the van, and drove back to the location on 48th Street where Rojas had left the blue Caravan. Rojas exited the gray van, entered the blue Caravan, and drove off. (July Tr. at 17–19.)

At this time, which was approximately 3:30 p.m., the team that had been conducting surveillance of Rojas split into two teams. Investigator Bruce Schwartz and certain other law enforcement officers continued the surveillance of Rojas; Special Agent John Kane, Detective Joseph Calvacca and others followed Llanos. (July Tr. at 19.)

Rojas returned to Macarina's, the second of the international telephone-calling places he had previously visited with Llanos. Rojas went into this location for approximately 10 to 15 minutes, returned to the blue Caravan, and again returned to the vicinity of the 48th Street location. Specifically, he parked just off 30th Avenue, approximately one block from the 48th Street location. (July Tr. at 19–21.)

Rojas exited his vehicle and walked toward the 48th Street location, holding a black duffel bag. He was approached by Investigator Schwartz and Detective Sergeant Niki Elders. Investigator Schwartz did not have his gun drawn. Sergeant Elders, however, had her weapon unholstered, and it was pointed

---

**1.** The suppression hearing was held on July 14, August 14, August 23 and September 29, 1995. "July Tr." refers to pages of the transcript of proceedings on July 14; "Aug. Tr." refers to the consecutively-numbered transcripts of August 14

at Rojas.[2] (Aug. Tr. at 190–93.) Schwartz identified himself in English as a police officer and asked for identification from Rojas. He also asked Rojas if he would open the bag. Rojas agreed to open the bag, and when Schwartz looked in it he saw brick-shaped objects wrapped in black electrical tape. He immediately concluded from the appearance of those objects that they were either cocaine or heroin, and Rojas was arrested. It was subsequently determined that Rojas's bag contained approximately 10 kilograms of cocaine. (July Tr. at 21–22, 39, 42; Aug. Tr. at 190–93.)

When Rojas was placed under arrest, he was advised of his *Miranda* rights by Schwartz and placed in the passenger seat of a car at the scene. Special Agent Christopher Ammirati arrived at the scene shortly thereafter and entered the vehicle containing Rojas. When Ammirati entered the vehicle, Investigator George Soto was already in the process of advising Rojas of his rights in Spanish. When Rojas stated that he spoke English, Ammirati then advised Rojas again of his rights in English. Rojas waived those rights and made a number of statements, including the statement that he would consent to a search of his residence. After first giving an incorrect address, he admitted that his address was the 20–46 31st Street address where the surveillance had commenced, and that location was searched by the officers. A loaded firearm was seized from under the mattress in the back bedroom. (July Tr. at 22–24; Aug. Tr. at 5–11.)

Meanwhile, Llanos was still under surveillance. After dropping off Rojas near the 48th Street location, Llanos was observed going to yet two more international telephone-calling locations.[3] While Llanos was exiting the second of these locations, the surveillance agents learned over the radio that Rojas had been arrested. Llanos was then followed to the 48th Street location, which he entered. Agent Kane followed Llanos into the building, saw him enter apartment 3F, and called for back-up assistance. Four additional officers then joined Kane outside the entrance to apartment 3F. (Aug. Tr. at 11.)

After a short time, the door opened and Llanos came out. As Llanos came out into the hallway, the third defendant, Armando Mosquera, wearing only his underwear, was observed in the open doorway to the apartment. (Aug. Tr. at 142–43).

Detective Calvacca approached Llanos in the hallway. Although Calvacca is not a Spanish speaker, he told Llanos that he was "Policia". As he approached Llanos, Calvacca did not have his weapon drawn. Although one other member of the law enforcement team did have a weapon drawn, the weapon was pointed down. (Aug. Tr. at 120–21.)

As Calvacca approached Llanos, Investigator George Soto, the Spanish-speaker among the law enforcement officials present, approached Mosquera. Soto had his gun drawn, but it was pointed down. In Spanish, he asked Mosquera for permission to search the apartment for narcotics, money, records of narcotics dealing, and weapons. Mosquera consented to the search, adding that the agents would not find anything in the apartment. (Aug. Tr. at 143–45.)

After Mosquera agreed to the search of the one-bedroom apartment, Agents Kane and Ammirati conducted a brief security sweep of it. While the security sweep was being conducted, Mosquera, who was still standing in the doorway, was placed in handcuffs.[4] At the conclusion of the security sweep, the handcuffs were taken off Mosquera. He and Llanos were thereupon taken into the apartment. Llanos was taken into the bedroom, the first room to the left as the apartment is entered; Mosquera was taken into the living room. (Aug. Tr. at 12, 146.)

Within a matter of one to two minutes, a black composition book containing narcotics records was seized in the living room of the

---

and 23; and "Sept. Tr." refers to the transcript of September 29.

**2.** Rojas testified that he was immediately surrounded by five or six officers. (Aug. Tr. at 193–200.) However, I do not credit this testimony.

**3.** These locations also apparently doubled as travel agencies.

**4.** Llanos, who was still in the hallway, was not placed in handcuffs. (Aug. Tr. at 32.)

apartment. In addition, the bedroom in the apartment contained two closets. Each of those closets contained loose floor boards, the removal of which resulted in the discovery and seizure of a total of approximately 52 kilograms of cocaine. After the discovery of the cocaine in the closets, Mosquera was placed under arrest. (Aug. Tr. at 12, 269.)[5]

As the search of the apartment was underway, Calvacca asked Llanos for identification. Llanos reached into his back pocket and handed Calvacca a wallet. Calvacca observed that there were "post 'ems" with figures on them in the wallet. Calvacca notified Ammirati of this, and together they compared the notations on the pieces of paper from Llanos's wallet to the narcotics records in the composition book found in the living room of the apartment. (Aug. Tr. at 14, 122.) The officers determined that they matched, and Llanos was then placed under arrest. (Aug. Tr. at 15, 123, 269.)

*The Defendants' Motions*

A. *Freddy Rojas*

Rojas has moved to suppress the evidence seized from him and his apartment, as well as statements that he made, on the ground that they are fruits of an illegal arrest. He also contends that he did not voluntarily consent to the search of the duffel bag or of his apartment. Finally, he claims that there was no valid waiver of his *Miranda* rights.

■ The initial stop of Rojas as he was walking toward the 48th Street location was a seizure. He was not free to leave at that point, and that was made amply clear to him by the circumstances of the stop, which included the pointing of a gun at him by Sergeant Elders.

■ There was no probable cause to support an arrest of Rojas at that time. However, the circumstances of the case supported a reasonable suspicion, based on artic-

ulable facts, that Rojas was engaged in narcotics trafficking. This type of reasonable suspicion can support a seizure that is less intrusive than an arrest, *i.e.,* an investigative stop or a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Posr v. Doherty,* 944 F.2d 91, 97–98 (2d Cir.1991).

■ Here, the agents had received a tip from a confidential source that Rojas was engaged in narcotics trafficking. Rojas had exited his home to use a pay phone on the corner on multiple occasions, a practice frequently employed by narcotics traffickers. Rojas and Llanos had engaged in suspicious behavior during the course of the surveillance. This included Rojas's parking a block away from the 48th Street location before entering Llanos' van to drive the last block; his proceeding with Llanos to three separate international telephone-calling locations; Rojas's return to one of the those locations after being dropped off near the 48th Street location by Llanos; Rojas's return once again to the vicinity of the 48th Street location and his carrying of the duffel bag towards it.[6] Even though any one of these actions in isolation might not have justified an investigative detention, reasonable suspicion is determined by the totality of circumstances, and even seemingly innocent conduct may form the basis of a reasonable suspicion. *United States v. Glover,* 957 F.2d 1004, 1010–11 (2d Cir.1992); *United States v. Forero–Rincon,* 626 F.2d 218, 221–22 (2d Cir.1980). In this case, the circumstances amply supported the law enforcement officers' suspicion that Rojas and Llanos had been engaged in narcotics trafficking.

■ The officers were thus entitled to conduct an investigative detention of Rojas. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). That of course does not end the inquiry. The next question is wheth-

---

5. After these seizures occurred, Investigator Soto sought a written consent to search from Mosquera. Mosquera refused to execute the written consent form. (Aug. Tr. at 149–50.)

6. Even though Rojas never reached his destination because he was intercepted by the police, the activities of that day give rise to a very strong (if not inescapable) inference that he was re-

turning to the 48th Street location at the time of the arrest. Rojas testified otherwise. He testified that he did not know what was in the bag and was delivering it to a person who was waiting for him in a car near the 48th Street location. I find this testimony incredible. (Sept. Tr. at 214–16.)

er the officers, despite their reasonable grounds for detaining Rojas, engaged in actions that were so intrusive that they converted an otherwise lawful investigative stop into an arrest. In order to be valid, an investigative detention must be no more intrusive than the circumstances warrant.

Rojas argues that the officials did not act reasonably, relying principally on the fact that a gun was drawn on him when he was initially stopped.[7] "A display of guns by the police, however, does not automatically convert a stop into an arrest." *United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir.1984). Rather, there are several factors that a court must consider in determining whether an investigative stop escalated into an arrest: the amount of force used; the need for such force; the extent to which the suspect's movement was restrained; the number of agents involved; and whether guns or handcuffs were used. *United States v. Perea*, 986 F.2d 633, 644–45 (2d Cir.1993). Also relevant are the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of the day, and the reaction of the suspect to the approach of the officers. *Nargi*, 732 F.2d at 1106 (citing *United States v. Harley*, 682 F.2d 398, 402 (2nd Cir.1982)); *see also United States v. Alexander*, 907 F.2d 269 (2d Cir.1990) (approaching a car with guns out, ordering the suspected narcotics trafficker out of the car and frisking him was not an arrest since "a law enforcement agent, faced with the possibility of danger, has a right to take reasonable steps to protect himself and an obligation to protect innocent bystanders").

Rojas relies on several cases that hold that a "*Terry* stop" had escalated to the level of an arrest where, *inter alia*, guns were drawn. In each of those cases, however, additional factors contributed to the conclusion that the stop involved was actually an arrest. In *Oliveira v. Mayer*, 23 F.3d 642 (2d Cir.1994), for example, the court held that a seizure was an arrest where six officers in six vehicles drew weapons on three

suspects—with no reasonable basis to assume that they were armed—and then ordered them out of the car, placed them in handcuffs after a pat-down and forced them to lie on the ground. The court stated that it was not any single factor that converted the investigative stop into an arrest, but the cumulative effect of the police actions. *Id.* at 646. *See also United States v. Moreno*, 897 F.2d 26, 31 (2d Cir.1990) (officers, with guns drawn, slammed defendant up against a wall); *United States v. Ceballos*, 654 F.2d 177, 184 (2d Cir.1981) (officers, with guns drawn, surrounded defendant with their vehicles and ordered defendant out of a car).

These cases all involved a greater degree of intrusiveness than was present in the stop of Rojas. He was approached in a public place during the daytime by only two officers. Only one gun was drawn, and he was neither handled nor handcuffed during the investigative stage of his detention. Nor was he detained for a lengthy period of time—it was only minutes after the initial stop that the officers saw the contents of his bag, which gave rise to probable cause for his arrest.

As the Second Circuit recognized in *Alexander*, *Nargi* and *Harley*, a police officer has the right and responsibility to protect herself by drawing her weapon when she deems it prudent. Since this case involved suspected narcotics traffickers, who are often armed, I conclude that it was reasonable for Sergeant Elders to have her weapon drawn at the time she and Investigator Schwartz approached Rojas, and that the initial stop and questioning of Rojas was not an arrest requiring probable cause.

Rojas contends that he never consented to a search of his bag and never waived his *Miranda* rights. He also contends that even if he did both, he did not do so voluntarily. The voluntariness of a consent to search and to waive *Miranda* rights depends on the "totality of the circumstances" and is an issue of fact for the trial

---

7. Rojas's claim in this regard has changed. His attorney's affidavit, which was verified in a separate statement by Rojas himself, stated that the agents wrestled Rojas to the ground at gunpoint and arrested him. Rojas's testimony at the suppression hearing did not include the allegation that he was wrestled to the ground, and that allegation has been abandoned.

court. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973); *United States v. Hernandez,* 5 F.3d 628, 632 (2d Cir.1993); *United States v. Moreno,* 897 F.2d 26, 33 (2d Cir.1990); *United States v. Marin,* 669 F.2d 73, 82 (2d Cir. 1982). Being in custody of or being confronted by police does not render a person incapable of voluntary consent. *United States v. Puglisi,* 790 F.2d 240, 243 (2d Cir.1986). Furthermore, there is no requirement that a person be informed of his right to refuse in order· for a consent search to be valid; a consent to search does not have to be "knowing" as long as it is voluntary. *Schneckloth,* 412 U.S. at 234, 247–48, 93 S.Ct. at 2051, 2058–59; *Moreno,* 897 F.2d at 33.

 In this case, the evidence shows that Rojas understood English[8] and voluntarily consented to the search of his bag. Although the presence of unholstered weapons can in some instances signal coercive police behavior, *United States v. Vasquez,* 638 F.2d 507, 524–25 (2d Cir.1980), that did not occur here. Sergeant Elders had her weapon drawn only as a precaution, and there is no evidence that she used it in a manner that coerced Rojas to consent to a search of the bag. The presence of a gun does not necessarily render consent involuntary, *United States v. Rothberg,* 460 F.2d 223, 224 (2d Cir.1972), especially if it was unholstered "only as a precaution." *United States v. Miley,* 513 F.2d 1191, 1204 (2d Cir.1975). From the totality of the circumstances in this case, I find that Rojas' consent to the search of the black duffel bag was voluntary.

I also find that his subsequent waiver of his *Miranda* rights was knowing and voluntary. Rojas was advised of his rights more than once, he understood them and he chose to waive him. In his statements to the questioning officers, he voluntarily consented to a search of his apartment. There is no evidence of coercion in connection with any of

these consents. Accordingly, Rojas' motion to suppress is denied.

**B.** *Humberto Llanos*

Defendant Llanos has moved to suppress evidence seized from his person and from the 48th Street location on the grounds that he was arrested without probable cause and that the search of the apartment was illegal.

As discussed above, the circumstances of the day's events, as observed by the surveillance team, gave rise to a reasonable suspicion that Rojas and Llanos were engaged in narcotics trafficking. Indeed, even if Llanos had not actively participated in the suspicious behavior of that day, his association with Rojas alone may have created a reasonable suspicion. *United States v. Tehrani,* 49 F.3d 54, 60 (2d Cir.1995) (finding defendant was reasonably detained because he was travelling with the suspect).

 Llanos makes much of the fact that he was not free to leave the hallway of the 48th Street location. All that signifies, however, is that a seizure occurred, and a seizure is not necessarily an arrest. *Tehrani,* 49 F.3d at 60. Llanos was seized in the hallway, not inside a home, and was not subjected to physical force. Five policemen were present, but one was talking to Mosquera and at least one more was standing at the staircase apart from Llanos. Although at least one gun was drawn, it was pointed down. As discussed above, the mere presence of an unholstered weapon is not enough to convert a valid *Terry* stop into an arrest. *Nargi,* 732 F.2d at 1102.

Although Llanos was required to go into the apartment with the officers, he was moved only several feet, and the length of his investigative detention was brief. The composition book containing narcotic records was found within minutes of the initial detention, and the discovery of similar notations on pieces of paper in Llanos' wallet occurred

---

8. Rojas contends that he was not sufficiently fluent in English to knowingly and intelligently waive his rights in that language. He argues that even if he answered "yes" to the officers' questions, that is an insufficient basis to conclude that he voluntarily waived his rights. (Rojas'

Mem. dated September 5, 1995, at 24–25.) However, I credit the testimony of Officer George Soto, a fluent Spanish speaker, who testified that Rojas insisted on speaking English and spoke it fluently. (Aug. Tr. at 151.)

shortly thereafter.[9] I conclude that the initial detention of Llanos did not exceed the permissible limits of a *Terry* stop.

Moreover, a contrary finding would not require the suppression of the evidence seized from Llanos, because I further conclude that the initial seizure of Llanos was supported by probable cause. Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989); *see also Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979). In order to establish probable cause, there need not be a "prima facie showing of criminal activity." *United States v. Travisano*, 724 F.2d 341, 346 (2d Cir.1983). Probable cause is instead a "fluid concept" that turns on the particular facts in each case. *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). Moreover, a determination as to probable cause depends upon the totality of the circumstances "as seen and weighed not by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

Here, the agents had received information that Rojas was engaged in narcotics trafficking. During the period from approximately 2:30 to 3:30, Rojas and Llanos engaged in a series of suspicious activities that were indicative of such criminal activity. Those activities included a visit to the 48th Street location, which Llanos entered. A short time after Rojas and Llanos went separate ways, Rojas was arrested—with 10 kilograms of cocaine—apparently on his way to the 48th Street location. Llanos himself also returned there a short time later. Because of Llanos' suspicious activities with Rojas,

and because of the very strong inference that Rojas was heading for the 48th Street location to meet Llanos when Rojas was intercepted by the police, there was probable cause to believe that Llanos was involved in a drug trafficking offense with Rojas.

Llanos contends that he did not consent to the search of his wallet, in which Detective Calvacca found the "post 'ems" matching the narcotics records in the composition book. I find otherwise. Consent can be by word or by deed. Llanos effectively consented to a search of the wallet by handing it Calvacca in response to Calvacca's request for identification. There is no indication that Llanos' will was overborne, and the motion to suppress evidence seized from the wallet is accordingly denied. In any event, even if there was no consent, I would uphold the seizure of Llanos' wallet as a lawful search incident to arrest, as I conclude that there was probable cause to arrest him when he walked out of the apartment into the hallway.[10]

Llanos also seeks the suppression of evidence seized from apartment 3F. As set forth below, that search was conducted lawfully with the consent of Mosquera, and thus Llanos' motion is denied in this respect as well.

### C. Armando Mosquera

Mosquera has moved to suppress the statements he made to the officers and the evidence seized from apartment 3F on the ground that they were the product of an illegal seizure and an illegal search. He claims that since he had not been observed at all prior to his appearance in the doorway of apartment 3F, there was no reasonable suspicion to support an investigative detention of him, let alone an arrest. Mosquera cites *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), in support of his contention that he was unreasonably detained in the doorway of his apartment.

---

**9.** I am troubled by the failure to produce the specific pieces of paper recovered from Llanos's wallet and by Calvacca's failure to recall the number of "post 'ems" taken. Nevertheless, I credit Calvacca's testimony that such notes were in fact found in Llanos's wallet.

**10.** The government also elicited statements from Llanos after his arrest but before *Miranda* warnings were given. The government concedes that these statements may not be offered at trial.

However, *Ybarra* held that merely being present in a public place where the police had a warrant to search, without any connection to the suspects, did not justify a *Terry* stop. *See also United States v. Jaramillo,* 25 F.3d 1146 (2d Cir.1994) (no reasonable suspicion existed when defendant was in a public place and had no known connection to the suspects of the investigation).

■■■■ Here, Mosquera was found in a private place—an apartment—and obviously had a connection to Llanos, as to whom there was both reasonable suspicion and probable cause. He also had a connection to the cocaine already seized from Rojas, as Rojas and Llanos had gone to that building earlier that afternoon, Llanos had entered it, and Rojas appeared to be returning there with the cocaine when he was arrested. While Mosquera's connection to Rojas' criminal activity was weaker than that of Llanos, it nevertheless constituted a reasonable suspicion to detain and question Mosquera. *See United States v. Barlin,* 686 F.2d 81, 87 (2d Cir.1982) (finding reasonable suspicion to detain a person who was previously unknown to investigating agents but arrived on the scene of the investigation "against a background" of suspected criminal behavior and seemed to be acting in relation to the suspect). The fact that Officer Soto was holding a gun when he approached Mosquera did not transform the investigative stop into an arrest. The gun was pointed down, and it was reasonable under the circumstances to have it unholstered as a precaution. Finally, the brief handcuffing of Mosquera during the security sweep did not transform the stop into an arrest.

■■■■ Mosquera voluntarily consented to the search of apartment 3F. The fact that he did not speak English and was new to this country is hardly significant. Officer Soto spoke with him in Spanish and obtained his consent in Spanish. Although Mosquera makes much of the fact that he was not advised of his right to refuse to consent, there is no requirement that such advice be given in order for consent to be voluntary. *Schneckloth,* 412 U.S. at 234, 247–48, 93 S.Ct. at 2051, 2058; *United States v. Forero–Rincon,* 626 F.2d 218, 224 (2d Cir.1980).

Mosquera also claims that he did not have the authority to consent to a search of apartment 3F and, specifically, to consent to a search of the bedroom. He further contends that a search of the traps under the floorboards of the closet exceeded the scope of consent even if his consent was authorized and voluntary.

■■■■ Consent to search a dwelling is valid only if obtained from someone who has access and authority or a substantial interest in the property. *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974). Generally, any co-tenant can consent to a search of a dwelling because co-tenants have common authority over the property. *United States v. Cataldo,* 433 F.2d 38, 40 (2d Cir.1970). In the case of roommates, while any one roommate can consent to a search of common areas and her own room, she cannot consent to a search of a bedroom if it does not appear that she has authority to do so. *United States v. Orejuela–Guevara,* 659 F.Supp. 882, 886 (E.D.N.Y.1987).

■■■■ Even if the person who consents to a search does not have actual authority to consent, the search will be valid if there was an objectively reasonable belief that the consenting person had such authority. *United States v. Matlock,* 415 U.S. 164, 169, 94 S.Ct. 988, 992, 39 L.Ed.2d 242 (1974). In *Matlock,* the court looked to whether the person had purported to be the resident of the dwelling and whether there was any evidence indicating this was false. *Id.* at 175–78, 94 S.Ct. at 995–96.

■■■■ If the consenting person lacked actual authority, it is the government's burden to show that it was objectively reasonable to believe that he had authority to consent. It is not always enough for the government to claim that the person said he had that authority. Instead, the government must point to evidence, such as a name on the lease or clothes and personal effects in the dwelling, supporting the claim or, at the very least the lack of evidence calling the statement into doubt. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990); *see also United States v. Gonzalez*

*Athehorta,* 729 F.Supp. 248 (E.D.N.Y.1990) (when a woman who claimed to live in the premises showed a license that listed an address in another state, the circumstances "cr[ied] out" for further investigation about whether she had authority).

 Here, Mosquera has failed to demonstrate that he lacked the authority to consent. In any event, it was objectively reasonable for the officers to conclude that he had such authority. Mosquera appeared at the door of a one-bedroom apartment in his underwear. There was no one else present in the apartment. He claimed to live there and his clothes and personal effects were in the apartment. Applying the standard set forth in *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, I conclude that there was no reason for the officers to have suspected that Mosquera did not live there. Unlike multiple bedroom "roommate" cases, the apartment here had only one bedroom, and the appearance of Mosquera at the door in his boxer shorts amply supported the officers' reasonable reliance on his apparent authority to consent to the search. I conclude that there was valid apparent authority for Mosquera to consent to a search of apartment 3F.[11]

 The standard for determining the scope of consent is "objective reasonableness," which is defined by the expressed object of the search unless a limitation is specified. *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). Because Mosquera did not limit his consent in any way, the officers were authorized to search the apartment anywhere that might reasonably house evidence of narcotics trafficking. While the officers did not have permission to cause physical damage to the apartment, *United States v. Restrepo,* 890 F.Supp. 180, 196–97 (E.D.N.Y.1995), opening the "traps" in the floor of the bedroom closets did not amount to physical damage. The floorboards were loose (Aug. Hear. at 97), and the investigating officers did not need to pry anything open in order to examine the contents of the "traps."

Finally, Mosquera claims that statements he made to police during the search should be suppressed since he had not yet been read his *Miranda* rights. However, I conclude that the information requested from Mosquera before any narcotics were found "falls within the benign category of 'basic identifying data required for booking and arraignment.'" *United States v. Gotchis,* 803 F.2d 74, 79 (2d Cir.1986) (quoting *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1113 (2d Cir.1975)). These "pedigree" questions were not intended to elicit incriminating responses. *United States v. Adegbite,* 846 F.2d 834 (2d Cir.1988), *after remand,* 877 F.2d 174, *cert. denied,* 493 U.S. 956, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). For these reasons, the statements Mosquera made before the discovery of drugs in apartment 3F will not be suppressed. Because I do not conclude that the statements elicited after the discovery of the drugs fall in the category of "basic identifying data," those statements may not be elicited at trial.

*Conclusion*

For the foregoing reasons, the defendants' motions to suppress are denied, except with respect to the statements elicited from Mosquera after the discovery of narcotics in his apartment. To that limited extent, Mosquera's motion is granted.

So Ordered.

───

**11.** Furthermore, if Mosquera did not have authority to consent to a search of the apartment, he lacked an expectation of privacy in the apartment and thus standing to challenge the search as violative of his Fourth Amendment rights.