**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 3 1999**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

GERALD JOHN LUJAN, JR.,

Defendant - Appellant.

No. 98-2275

(D. New Mexico)

(D.C. No. CR-98-37-JC)

**ORDER AND JUDGMENT** *

Before **ANDERSON** , **TACHA** , and **BALDOCK** , Circuit Judges.

On June 29, 1998, after the district court denied his motion to suppress,

Gerald John Lujan pled guilty to possession with intent to distribute marijuana, in

violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2.  Lujan now

appeals from the district court's denial of his motion to suppress.  For the reasons

discussed below, we affirm the judgment of the district court.

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

# BACKGROUND

Except where noted, the following facts were found by the district court at the suppression hearing and are undisputed on appeal. On January 6, 1998, United States Border Patrol Agent Luis Armendariz was on patrol in Las Cruces, New Mexico. At that time, Armendariz had over six years of experience as a Border Patrol agent and had participated in over 200 drug seizures, approximately 150 of which had involved searches of vehicles with hidden compartments. The area which Armendariz was patrolling on January 6 was an area near the junction of Interstates 10 and 25, only 35 miles north of the Mexican border, and was known to Border Patrol agents as an area of heavy drug trafficking. The area contained numerous motels, service stations, and fast food restaurants, and Armendariz had personally been involved in several drug seizures in this small area.

Areas such as this one, which are near border-area freeways and typically have a great number of people driving through them, are known to Border Patrol agents as "staging areas" where drug traffickers can pull off the freeway, move inconspicuously to a pay phone, and contact persons in other vehicles, known as "scout vehicles," which have driven on to ascertain whether the permanent Border Patrol checkpoints are operational at that particular time. Armendariz had, on numerous occasions, witnessed drug traffickers in staging areas loitering near pay

phones waiting to contact their scout vehicles. He stated that drug traffickers prefer pay phones because calls from such phones are more difficult to trace than calls from cellular phones or home phones.

On January 6, at approximately 4:30 P.M., Armendariz observed a maroon Lincoln parked near a Comfort Inn motel. This particular vehicle caught Armendariz's attention because, just in the past few days, he had discovered a cache of drugs in a hidden compartment of a Lincoln. Armendariz stated that drug traffickers often use large vehicles, because such vehicles have easily modifiable cavities which can be used to create concealed compartments. He also stated that drug traffickers tend to act in patterns with respect to the type of vehicles they use, and that they often use the same model or make of vehicle until law enforcement officers become aware that this particular vehicle is in favor, at which time the traffickers begin to use a different make of vehicle.

Armendariz saw the lone occupant of the Lincoln, the Defendant Lujan, exit the vehicle and walk across the parking lot to a bank of pay phones. Armendariz watched as Lujan made two calls from a pay phone. As Lujan was talking on the pay phone, Armendariz pulled his unmarked vehicle into a parking stall adjacent to the Lincoln, and ran a registration check on the car's license plates. He discovered that the Lincoln was registered to one Manuel Diaz of

Bernalillo, New Mexico. Bernalillo is a town near Albuquerque and is located approximately 250 miles north of Las Cruces.

While Lujan was talking on the pay phone, he glanced in Armendariz's direction two times. After completing his conversation, Lujan left the pay phone area and walked across the parking lot to the entrance of a Chevron station. When he reached the door of the Chevron, he hesitated for a moment, then elected not to enter the station. Lujan then walked back into the parking lot toward the Lincoln and Armendariz's vehicle. As he approached the two cars, he saw Armendariz sitting in the unmarked car. Although the car was unmarked, Armendariz was wearing his green Border Patrol uniform. When Lujan saw Armendariz, he quickly jerked his head away, and, instead of stopping at the vehicles, he "veered and walked past the [vehicles]" and walked toward the entrance to the Comfort Inn. I R. Tab 34, at 3. One to two minutes later, Armendariz exited his vehicle and followed Lujan into the Comfort Inn.

As Armendariz was walking into the motel, Lujan was walking back out of it. The two men met just outside the entry to the motel. At this late afternoon hour, there were many other people around. As Lujan walked past Armendariz, the agent identified himself as a Border Patrol agent. Armendariz did not block Lujan's path, and did not make any threats or unholster or even handle his weapon. Armendariz asked Lujan whether he was a citizen of the United States.

-4-

Lujan replied in the affirmative. According to Armendariz's testimony at the suppression hearing, Lujan appeared "extremely nervous," his face appeared tense, and he had a "deer in the headlights look" on his face. II R. at 24. At this point, Armendariz asked Lujan for proof of his citizenship, and Lujan produced his driver's license. When Lujan handed over the license, Armendariz noticed that Lujan's hands were trembling.

An examination of the license revealed that Lujan was indeed a United States citizen, living in Las Vegas, New Mexico. However, Armendariz also saw that the name on the license was "Gerald Lujan" and not "Manuel Diaz." This fact was significant to Armendariz, because his experience had demonstrated that most vehicles used in drug trafficking are not registered to the person driving the vehicle. Armendariz then asked Lujan who owned the vehicle, and Lujan replied that a man named "John" was the owner. Lujan supplied a last name as well, but Armendariz could not recall the last name given to him by Lujan. Armendariz did recall, however, that the last name was something other than Diaz.

At this point, there is a discrepancy in the testimony which the district court did not resolve. Armendariz stated that at this point, he gave Lujan's driver's license back to him after questioning him about it. Lujan, by contrast, testified that Armendariz placed the license in the front pocket of his uniform and did not return it until much later.

In any event, Armendariz then asked to see the Lincoln's registration. Lujan walked over to the car and retrieved the registration information. The registration certificate bore the name of Manuel Diaz. Armendariz pointed out to Lujan that the name on the certificate was not "John," the name Lujan had given previously as the owner of the vehicle. Lujan then became even more nervous than before, and stated simply that he could not explain the discrepancy, and that he had borrowed the Lincoln from his uncle.

Armendariz then asked Lujan where he had come from, and Lujan reported that he had driven down from Albuquerque. Armendariz could observe no luggage in the Lincoln, however, and asked Lujan about this. Lujan responded that he had stopped in town at a friend's house and had dropped off his luggage. Lujan also told Armendariz that he had been experiencing engine trouble with the Lincoln and that the reason he stopped at the pay phone was to call his friend to come to pick him up.

At about this point, a purple car arrived and parked beside the Lincoln. David de la Paz emerged from the vehicle, and Lujan identified de la Paz as the friend with whom he had left his luggage, and whom he had telephoned from the pay phone. De la Paz confirmed these details upon questioning by Armendariz.

Armendariz then asked Lujan if he could search the trunk of the Lincoln. Lujan gave consent to the search of the trunk, and even opened the trunk himself.

Upon examination, Armendariz observed that the trunk appeared empty, but that he noticed "a discrepancy in the depth of the [trunk] between the backrest of the back seat and the trunk area . . . leading out towards the trunk where the lid opens." II R. at 34. Based on his experience, Armendariz thought that this discrepancy could indicate the presence of a hidden compartment. At that point, Armendariz retrieved his dog, a trained and certified drug-sniffing dog, from his unmarked vehicle.

At some point during the course of these events, de la Paz asked Armendariz if he could leave to go pick up his daughter, and Armendariz told him that he was not free to leave.

As the dog approached the rear of the Lincoln, it "alerted"—indicated that the scent of drugs or contraband was present. The dog then jumped into the trunk, and ran around in it, then jumped out and back in again. While the dog was in the trunk, Armendariz again observed it alert to the presence of contraband.

Armendariz then radioed for backup. When the other agents arrived, Armendariz conducted a search of the trunk and discovered a hidden compartment containing approximately 160 pounds of marijuana. Agents then arrested both Lujan and de la Paz.

On January 21, 1998, a federal grand jury returned a one-count indictment against Lujan, charging him with possession with intent to distribute more than 50 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.

On March 16, 1998, Lujan moved to suppress the marijuana found in the trunk of the Lincoln, arguing that Armendariz had not had the requisite reasonable articulable suspicion to detain and question Lujan, and that Lujan had not given voluntary consent to open and search the trunk of the Lincoln.

The district court held an evidentiary hearing on April 3, 1998. Armendariz testified first, followed by de la Paz and Lujan. Armendariz was then called as a rebuttal witness as well. On June 1, 1998, the district court denied Lujan's motion. See I R. Doc. 34. The court held that the first stage of the encounter between Armendariz and Lujan was consensual. However, after Lujan handed Armendariz his driver's license and (according to Lujan) Armendariz did not return it, the district court found that the encounter was no longer consensual, but that Armendariz had reasonable suspicion to detain and question Lujan. The court listed eleven facts that it held collectively amounted to reasonable articulable suspicion. Also, the district court held that Lujan "freely consented to an inspection of the trunk of his vehicle," id. at 12, and that the search of the trunk was lawful and did not violate Lujan's Fourth Amendment rights.

Following the district court's denial of his motion to suppress, Lujan pled guilty to the count in the indictment. The plea was a conditional guilty plea, which allows him to appeal the district court's decision to deny his motion to suppress. The district court accepted Lujan's plea, and sentenced him to 24 months' imprisonment and three years' supervised release.

**DISCUSSION**

In his appellate briefs, Lujan raises the same two points raised before the district court below: (1) that Armendariz did not have the required reasonable articulable suspicion to detain and question Lujan; and (2) that Lujan did not voluntarily consent to Armendariz's search of the trunk of the Lincoln. Although Lujan's oral argument was largely focused on the second issue, we will nevertheless address the issues in the order presented in the appellate briefs.

**I.     Did Armendariz Have Reasonable Suspicion to Detain Lujan?**

"When reviewing a district court's denial of a motion to suppress, we accept its factual findings unless clearly erroneous and view the evidence in the light most favorable to the government." United States v. Hargus, 128 F.3d 1358, 1361 (10th Cir. 1997), cert. denied, 118 S. Ct. 1526 (1998). It is the province of the trial court to assess the credibility of witnesses at the suppression hearing and

to determine the weight to be given to the evidence presented, and we must give such determinations due deference. Id. However, the district court's ultimate conclusion that law enforcement officers had reasonable articulable suspicion of criminal activity is reviewed de novo. United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998).

There are three general types of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, [which are] the most intrusive . . . and [are] reasonable only if supported by probable cause." United States v. Davis, 94 F.3d 1465, 1467-68 (10th Cir. 1996) (citations omitted). The second of these types of encounters is at issue in this case: an investigative detention which must be supported by a reasonable articulable suspicion of criminal activity.

A suspect "has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554 (1980). The district court held, and the parties do not contest, that Lujan was "seized" for Fourth Amendment purposes when he surrendered his driver's license to Armendariz, and, assuming arguendo that

Lujan's version of the disputed fact is correct, when Armendariz refused to return Lujan's license.   See Florida v. Royer , 460 U.S. 491, 501-02 (1983) (plurality opinion) (holding that when a suspect's ticket and driver's license were retained by identified narcotics agents, the suspect was "effectively seized for the purposes of the Fourth Amendment");   United States v. Lambert , 46 F.3d 1064, 1068 (10th Cir. 1995) (stating that "what began as a consensual encounter quickly became an investigative detention once the agents received [the suspect's] driver's license and did not return it to him").  Armendariz could lawfully detain Lujan in such a manner only if he had reasonable articulable suspicion that Lujan was engaged in criminal activity. [1]

Reasonable articulable suspicion is "something more than an 'inchoate and unparticularized suspicion or hunch,'" but is something "less than proof of wrongdoing by a preponderance of the evidence."      United States v. Sokolow , 490 U.S. 1, 7 (1989) (citations omitted).  The "probable cause" standard, which requires only "a fair probability that contraband or evidence of a crime will be found," Illinois v. Gates , 462 U.S. 213, 238 (1983), is a more demanding standard than the reasonable articulable suspicion standard.      See Sokolow , 490 U.S. at 7.

---

[1]Although Lujan, at oral argument, appeared to abandon any argument that an unlawful detention occurred prior to the point at which Armendariz asked for consent to search the trunk of the Lincoln, it appears plain, both from Lujan's appellate briefs and from the case law cited above, that a detention requiring reasonable suspicion began when Armendariz refused to return Lujan's license.

In determining whether reasonable suspicion exists in a particular case, "the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981). Even factors that by themselves are not "proof of any illegal conduct" may be, "taken together" in the aggregate, sufficient to "amount to reasonable suspicion." Sokolow, 490 U.S. at 9; see also United States v. De la Cruz-Tapia, 162 F.3d 1275, 1279-80 (10th Cir. 1998) (stating that "we assess the impact of the factors in the aggregate, under the totality of the circumstances, incorporating the underlying factual findings of the district court"). We must also keep in mind "that, when used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion." Cortez, 449 U.S. at 419.

The district court listed eleven factors in support of its conclusion that Armendariz had reasonable articulable suspicion that Lujan was involved in criminal activity. I R. Doc. 34, at 10-12. We think these eleven factors can be distilled to six pre-detention factors: (1) the location of the car; (2) the type of car involved; (3) the fact that Lujan used a pay phone; (4) the fact that Lujan seemed to try to evade Armendariz as soon as he saw him in uniform; (5) Lujan's

nervousness; and (6) the fact that the Lincoln was registered to a person other than its driver. We must examine these seemingly innocuous facts and determine whether, in the aggregate, they can amount to reasonable articulable suspicion that Lujan was engaged in criminal activity.

The first factor, the location of the car, is clearly a factor that a law enforcement officer may consider in determining whether to detain a suspect. In this case, the car was parked in a location only 35 miles from the U.S.-Mexico border, and was in a known "staging area" for drug trafficking. "[T]he fact that an individual is in a neighborhood known for drug activity is not sufficient by itself to support a reasonable suspicion that the individual himself is engaged in criminal activity," but this fact "can support a finding of reasonable suspicion when combined with other factors." United States v. Soto-Cervantes, 138 F.3d 1319, 1323 (10th Cir.), cert. denied, 119 S. Ct. 131 (1998); see also United States v. Gutierrez-Daniez, 131 F.3d 939, 942-43 (10th Cir. 1997), cert. denied, 118 S. Ct. 1334 (1998). Therefore, the fact that Armendariz noted that Lujan's vehicle was in a known "staging area" is a factor that may be used, in conjunction with other factors, to support a finding that Armendariz had reasonable articulable suspicion to detain Lujan.

The second factor—the fact that Lujan was driving a Lincoln—is also a factor that may be considered. We have stated that "[t]he mere fact that a vehicle

-13-

has a large capacity cannot be sufficient to support a reasonable suspicion of criminal activity." Salzano, 158 F.3d at 1112. However, while vehicle characteristics cannot, by themselves, support a finding of reasonable suspicion, they are factors that may be considered, as part of the totality of the circumstances, along with other contributing factors. "In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider . . . aspects of the vehicle." United States v. Lopez-Martinez, 25 F.3d 1481, 1483-84 (10th Cir. 1994) (quoting United States v. Monsisvais, 907 F.2d 987, 990 (10th Cir. 1990) (citing United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975))). We have specifically considered the "[a]spects and [a]ppearance of the [v]ehicle" in prior cases. Lopez-Martinez, 25 F.3d at 1486; see also United States v. Pollack, 895 F.2d 686, 690 (10th Cir. 1990) (considering, among other factors, the fact that the suspect "was driving a large vehicle capable of hauling a large number of people"). Especially when we take into account the Supreme Court's admonition that objective facts can mean more to trained law enforcement officers than to untrained laymen, Cortez, 449 U.S. at 419, we are convinced that Armendariz properly considered the type of vehicle driven by Lujan. Armendariz testified that he had personally been involved in a drug seizure involving a Lincoln just a few days prior to his encounter with Lujan, and that drug traffickers tend to act in patterns with regard to the type of vehicles they use.

-14-

Thus, we conclude that, under these specific circumstances, the fact that Lujan was driving a Lincoln is a factor that may be considered, in conjunction with other factors, to support a finding of reasonable suspicion.

The third factor was Armendariz's observation that Lujan used a pay phone to place two calls immediately after exiting his vehicle. Courts have considered this fact as part of the reasonable suspicion calculus. See, e.g., United States v. Gonzales, 79 F.3d 413, 422 (5th Cir. 1996) (finding that the officers had reasonable suspicion based on, inter alia, the fact that the suspects "stopped to use pay phones"); United States v. Rojas, 906 F. Supp. 120, 125 (E.D.N.Y. 1995) (finding that the officers had reasonable suspicion based on, inter alia, the fact that the suspect had "exited his home to use a pay phone on the corner on multiple occasions, a practice frequently employed by narcotics traffickers"); cf. United States v. Ceballos, 719 F. Supp. 119, 124 (E.D.N.Y. 1989) (considering the fact that the suspect had made a call from a pay phone in a known narcotics location to a beeper "as one indication that drug trafficking may be afoot"). In this case, Armendariz testified that, in his experience, drug traffickers often used pay phones in this particular area, and that they preferred pay phones to other types of phones. Under these circumstances, the fact that Lujan made two calls from a pay phone in a known narcotics location is a factor that can be considered as part of the reasonable articulable suspicion inquiry.

-15-

The fourth factor contributing to Armendariz's suspicion of Lujan is Lujan's apparent attempt to evade Armendariz after Lujan spotted the uniformed officer sitting in his unmarked car. The district court found that Lujan "approached the Lincoln beside which Agent Armendariz had parked his vehicle, and upon getting close enough to Agent Armendariz to observe his uniform, [Lujan] reacted by jerking his head away and by veering off in a different direction toward the entry to the Comfort Inn instead of continuing to his car." I R. Tab 34, at 11. An attempt by a suspect to evade law enforcement officers is a factor that may be considered as part of the reasonable articulable suspicion calculus. See Florida v. Rodriguez, 469 U.S. 1, 6 (1984) (stating that the suspect's "attempt to evade the officers aroused further justifiable suspicion"); Lopez-Martinez, 25 F.3d at 1483-84 (stating that "[i]n determining whether there is reasonable suspicion to stop a car in the border area, officers may consider . . . any obvious attempts to evade officers" (citing Brignoni-Ponce, 422 U.S. at 884-85)). Lujan's particular attempt to evade, however, which consisted only of veering off and walking in another direction, cannot be the sole basis for an officer's reasonable suspicion. See United States v. Santillanes, 848 F.2d 1103, 1105-08 (10th Cir. 1988) (finding no reasonable suspicion in a case where the suspect, among other things, "veered away and started to walk at an increased

pace"). But it is a factor that may, along with other facts, be considered in the totality of the circumstances.

The fifth factor—Lujan's nervousness—may also, under certain circumstances, be considered as a factor contributing to reasonable articulable suspicion. However, "[n]ervousness alone cannot support reasonable suspicion of criminal activity," and we have stressed that because "most people . . . 'exhibit signs of nervousness when confronted by a law enforcement officer,'" nervousness may be considered only when the suspect exhibits "signs of nervousness beyond those normally anticipated during a citizen-police encounter." Salzano, 158 F.3d at 1113 (quoting United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997)). Here, Armendariz testified, and the district court found, that Lujan was "extremely nervous," his "face was tense," and "his eyes were wide open like the eyes of a deer caught in a headlight," and that Lujan's hands were trembling when he handed his driver's license to Armendariz. I R. Tab 34, at 4. We see nothing in the record to persuade us that this finding is clearly erroneous. Thus, Lujan's "extreme" nervousness may be taken into account as one factor, among others, contributing to a reasonable suspicion that criminal activity may be afoot.

The sixth and final factor is that Lujan did not own the vehicle he was driving. Armendariz testified, and the district court found, that "most vehicles

that are loaded with contraband are not registered to the driver" and that "[f]inding that a name and address on a registration do not match a name and address on a driver's license is consistent with drug smuggling."  I R. Tab 34, at 4.  We have held that the fact that a suspect "provided registration papers which did not establish [the suspect] as the owner of the [vehicle]" can support, when coupled with other factors, a reasonable suspicion of criminal activity.  United States v. Betancur , 24 F.3d 73, 78 (10th Cir. 1994);  see also  United States v. Turner , 928 F.2d 956, 959 (10th Cir. 1991) (finding that an officer had a reasonable suspicion that the suspect was engaging in criminal activity where the suspect, among other things, "was driving a car that was not registered to him or to his passenger").  The fact that Lujan was driving a car registered to someone else could properly contribute to a reasonable suspicion of criminal activity.

Therefore, while it is unlikely that any of the six factors could, standing alone, support a reasonable suspicion of criminal activity in this case, each of them may be considered in combination with other factors, and may, in the aggregate, contribute to a finding of reasonable articulable suspicion.  In this case, we think that the presence of all six factors leads inescapably to the conclusion that Armendariz had a reasonable articulable suspicion that Lujan was engaged in criminal activity.  These seemingly innocuous circumstances, taken together and viewed through the lens of an experienced Border Patrol agent, add

up to a reasonable suspicion that Lujan was trafficking in illegal drugs. In sum, Armendariz was acting within the law when he detained and questioned a person who made two phone calls from a pay phone in a staging area, was driving a vehicle known to Armendariz to be a type favored by drug traffickers and which was registered in someone else's name, appeared to try to evade Armendariz, and acted "extremely nervous."

Lujan argues, however, that any reasonable suspicion Armendariz might have had ceased to exist when Armendariz discovered that Lujan was an American citizen and when de la Paz arrived and confirmed part of Lujan's story. We disagree. Armendariz had reason to suspect that Lujan was in possession of illegal drugs, not merely that Lujan was an illegal alien. Furthermore, de la Paz confirmed only minor details of Lujan's account. He confirmed that Lujan had delivered luggage to his house, and that Lujan had called him from the pay phone. However, Armendariz observed Lujan make two calls from the pay phone, only one of which, presumably, was to de la Paz. Even assuming that the facts confirmed by de la Paz are accurate, Armendariz still had reasonable suspicion to believe that Lujan was engaged in criminal activity. [2]

---

[2]If anything, Armendariz's reasonable suspicion was heightened, rather than allayed, by several post-detention events. First, Lujan told Armendariz that the Lincoln belonged to "John" rather than to the true owner, Manuel Diaz. See United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990) (finding that an

(continued...)

Therefore, we conclude that Armendariz's investigative detention of Lujan was proper, and did not offend the Fourth Amendment.

## II.     Was Lujan's Consent Voluntary?

Lujan's final argument is that, even assuming that Armendariz had reason to suspect Lujan of criminal activity, Lujan's consent to search the trunk of the Lincoln was not voluntarily given.  Lujan argues that his consent was not voluntary because Armendariz never informed Lujan that he was free to refuse to consent to a search.

"Whether a defendant freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances."  United States v. Pena   , 143 F.3d 1363, 1366 (10th Cir.),     cert. denied  , 119 S. Ct. 236 (1998).  The district court found that Lujan "said that [Armendariz] could go

---

2(...continued)
officer had reasonable suspicion based on, among other things, the suspect's statement "that the vehicle belonged to his brother" when in fact it did not, and his complete lack of knowledge of the registered owner of the vehicle).  Second, after Lujan opened the trunk, Armendariz saw signs of a possible hidden compartment.  See United States v. Soto, 988 F.2d 1548, 1558 (10th Cir. 1993) (upholding a finding of probable cause to arrest a suspect based on the officer's conclusion, after examining the back seat of the suspect's vehicle, that there was probably a hidden compartment there).  Finally, Armendariz's drug dog alerted to the presence of contraband as it approached the Lincoln, and even before it entered the trunk itself.  See United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir. 1993) (holding that a dog alert to the trunk of a car by itself constitutes probable cause to search the trunk).

ahead and look [in the trunk] and that there was nothing in the trunk," and that

Lujan himself "popped the trunk lid open." I R. Tab 34, at 6. We must defer to

this finding of fact unless it is clearly erroneous.

In applying the totality-of-the-circumstances test, we have used a two-step

approach. First, we must determine whether the government has presented "clear

and positive testimony that consent was unequivocal and specific and freely and

intelligently given." Pena, 143 F.3d at 1366. This part of the test is clearly met

in this case. Armendariz, de la Paz, and even Lujan himself all testified at the

suppression hearing that Lujan gave consent to search the trunk. It is undisputed

that Lujan gave unequivocal consent to search.

Second, if the first step is satisfied, we must then determine whether the

government has demonstrated that "the police did not coerce the defendant into

granting his consent." Id. It is this portion of the test that Lujan stresses, arguing

that because Armendariz did not advise Lujan that he was free to refuse to

consent, the consent was not voluntary. However, the test is not that simple. We

have stated that "[t]he giving of such advisements is relevant to the inquiry," but

that the failure to give such advice is "not dispositive." United States v. Little, 60

F.3d 708, 713 (10th Cir. 1995); see also United States v. Sanchez-Valderuten, 11

F.3d 985, 990 (10th Cir. 1993) (stating that "[w]hether a defendant is informed

that he need not consent to a search is only one factor in determining whether consent was voluntary").

Under the circumstances of this case, Lujan's consent cannot be said to have been coerced. While "any individual being subjected to an investigative detention will feel some degree of compulsion to acquiesce to an officer's request," United States v. Soto, 988 F.2d 1548, 1558 (10th Cir. 1993), there is no evidence in this case of any duress or coercion. Here, the encounter between Armendariz and Lujan took place in the entryway of a busy motel at 4:30 in the afternoon, and the district court specifically found that "there were many people around the area." I R. Tab 34, at 4. Armendariz was, at the time consent was initially given, the only law enforcement officer on the scene; indeed, with de la Paz on the scene, there was only one officer and two suspects. Additionally, it is undisputed that Armendariz did not wield, brandish, unholster, or in any other manner make reference to his weapon during the encounter. Under remarkably similar circumstances, we have held that consent was voluntarily given. See Sanchez-Valderuten, 11 F.3d at 990; see also United States v. Flores, 48 F.3d 467, 469 (10th Cir. 1995) (finding consent to be voluntarily given even where the agent retained the suspect's driver's license and did not inform the suspect of her right to refuse consent, because the suspect clearly stated that she consented to

the search and the encounter took place in a public area in the daytime and the agent did not threaten the suspect in any way).

Therefore, we conclude that Lujan freely and voluntarily gave his consent to search the trunk, and that Armendariz did not coerce him into consenting. Accordingly, the search of the Lincoln's trunk was proper.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the judgment of the district court.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge